Bannon *vs.* Warfield.

(Decided 10th March, 1875.)

MICHAEL BANNON *vs.* SETH W. WARFIELD.

*Practice: Manner of introducing Evidence—Appeal—Practice— What is necessary to make the act of an Agent done without authority, binding upon his Principal— What an Appellant is required to show—Practice in the Court of Appeals— What is essential to justify a Reversal—Evidence.*

The question as to the mere order of proof, and under what circumstances evidence may be admitted or rejected when offered out of the proper order, in the absence of some positive rule of Court upon the subject, rest in the discretion of the Court directing the trial, as the tribunal best qualified to judge what the justice of the case may require in these respects; and hence from the rulings on such questions no appeal will lie.

The introduction of improper or immaterial evidence on one side does not justify the introduction of irrelevant matter on the other.

To make the act of an agent done without the authority of his principal, binding upon the latter, it is necessary to show that he subsequently ratified and adopted the act; and to make such ratification and adoption effectual as against the principal, it must be shown that he had previous knowledge of all the material facts; and if he assented while ignorant of those facts, he is at liberty to disaffirm the transaction when informed of them.

The party appealing should in all cases be able to show, from the record, that he has sustained real injury by reason of the rulings of the Court below,

which form the ground of the appeal; and where the Appellate Court can see that the trial below was fairly conducted, and that the law of the case was fully and substantially applied,—the appellant obtaining the benefit of all the law to which he was entitled, or which he sought to obtain,—there can be no good reason for reversing the judgment for matters immaterial, or upon mere refinements as to the terms in which propositions have been submitted to the jury. To justify a reversal there must be substantial error apparent, and that to the prejudice of the appellant.

Where an agent lends the money of his principal upon a security which proves to be insufficient, the judgment of such agent as to the value of the security at the time it was taken is not conclusive; evidence may be introduced, as reflecting on the question of the want of good faith and reasonable care in making the loan and taking the security, to show that the value of the security was very much less than the estimate placed thereon by the agent.

APPEAL from the Circuit Court for Anne Arundel County.

*First Exception.*—This exception is stated in the opinion of the Court.

*Second Exception.*—The defendant to maintain the issues on his part, being examined as a witness, testified as follows: About two weeks before the 8th of October, 1868, Mr. James Revell applied to me to borrow for his brother, Dr. W. T. Revell, the sum of fifteen hundred dollars, on his note and mortgage on his farm; I told him I had no money, but was expecting some to come in from a gentleman named Attrill, who had stated when he borrowed the money that he might pay it off in advance; the money was due to the plaintiff; I afterwards acquainted the plaintiff with the fact that Mr. Revell had applied to me to borrow $1500 for Dr. Revell; he said he had no money; I told him that his money due by Attrill would come in before maturity; that I had examined the farm of Dr. Revell, which I described and the improvements; told him the land was worth in the neighborhood of $60 per acre; and I told him all about it; I also told him that Mr. James Revell would prepare the note and mortgage, to be

executed by his brother and his wife; Mr. Warfield told me to lend this money to Dr. Revell when I got it in from Attrill; Mr. Revell came to my office in Baltimore, on the 8th October, 1868; I told him the condition of the loan; that Mr. Warfield would charge ten per cent. and that the bonus of sixty dollars would have to come off; he asked me to let him have the money then as judgments were pressing his brother, and said he would give me his note at ten days, which would give time to examine the title, I gave him my check for $1440, and he drew and gave me his note for that amount at ten days, on condition that as soon as I received the note and mortgage from his brother, I should mail to him his ten days note; Attrill, the gentleman who had borrowed Mr. Warfield's money, came to my office to get his note for $1500 which Mr. Warfield held; Mr. Warfield came to my office and I told him the gentleman wanted the note, and he asked what security am I to have until Mr. Revell prepares the note and mortgage for his brother; I told him that the money was needed to pay judgments due by Dr. Revell, that I had Mr. James Revell's note for this money, and that I was to return it to him whenever he sent me the note and mortgage, and that I could give it to him on condition that as soon as I got the note and mortgage he would return it to me; I was to send him word and he was to bring the note; the note of Dr. Revell's was to bear date of the day James Revell got the money; he said that was satisfactory; he only wanted to have something to show where the money was in the interim; the date of the delivering of James Revell's note to Mr. Warfield I don't remember, he was not in town for a month or more after; when he came down I gave it to him, I told him I had received from J. Revell his brother's note, but not the mortgage; some delays had occurred on account of the sickness of Mrs. Revell as I would not take the mortgage without her signature; I told Mr. Warfield that I had received the note, but not

the mortgage; he said never mind, you hold on to the note until I come down again, and when you get the mortgage put it on record; he came in sometime after this and asked me if I had received the mortgage: I told him, yes, and that I had sent it for record to Annapolis; he said that was all right; he had previously given me instructions to have it recorded when I received it; it ran on in this way until a year expired, when he told me that Dr. Revell had not paid any interest; I said I would write to James Revell and did so; Warfield came again and said he had heard nothing from me or Dr. Revell; I suggested to him to go to Annapolis and see James Revell or to go to see Dr. Revell; * * * * I gave to the plaintiff James Revell's note about a month after I received it; I offered this note of Dr. Revell's to Mr. Warfield six or eight months, it may have been eight or nine months, afterwards, I told him about Mr. Revell's demanding this note of his, and he never gave it up to me; Mr. Revell was dunning me, and demanding his note; I could not offer Mr. Warfield Dr. Revell's note, until I got the mortgage, because the transaction was not complete until then, and Mr. Revell was in no condition until then to demand his note. I was acting in this transaction as agent for the plaintiff, and always consulted him about the matter, and he acquiesced in what I did. I never got a dollar from Mr. Warfield or any one else in this transaction. The defendant offered in evidence the note for $1500 from Dr. Revell, dated 8th of October, 1868, and also the mortgage from him and his wife to the plaintiff, and proved that they are the same papers referred to in his evidence. (The affidavit as to the truth and *bona fides* of the consideration expressed in the mortgage, was made by the defendant as the agent of the plaintiff.)

James Revell, on the part of the defendant, testified as follows: Sometime previous to October 8th, 1868, my brother requested me to negotiate a loan for him of $1500.00, giving me full authority to make the best terms

I could; I went to Mr. Bannon after having acquainted myself with the character of the liens on the property of my brother, and communicated them to Mr. Bannon; Mr. Bannon would not consent to loan the amount until he had seen the property; Mr. Bannon and I went to the place by appointment and remained all night, walked over and examined the property critically; * * * * considering its advantages, I think the property was worth at that time about $50 or $60 per acre, improved as it then was; Mr. Bannon agreed to lend the money; I am not positive whether on that day Mr. Bannon promised to lend the money—I to apply it; I went to Baltimore and saw Mr. Bannon on the 8th of October, and had a general conversation with him about the loan and arranged the details; I was to prepare the mortgage from Dr. Revell and wife to the plaintiff; thinking the matter could be arranged in ten days, I gave Mr. Bannon my note at ten days for $1440 upon the condition that when the mortgage and note had been executed I was to have my personal note returned to me; I forwarded the mortgage note with the understanding that the mortgage would be prepared, referring to this note; the mortgage was prepared in my office and I identified the note as of October 8th, 1868, and referred to it as a stamped note; I received the $1440; I came home and stated to the gentlemen who were pressing my brother that I would settle as soon as I could prepare a statement.

Owing to some reason which I cannot now recollect, the mortgage was not immediately executed and forwarded to Mr. Bannon; no other liens had accrued in the meantime; I sent the mortgage note a short time after October 8th, and the mortgage afterwards; I called subsequently on Mr. Bannon for the note which I gave him, or perhaps wrote to him previously, and then when I called, he informed me he had given the note to Mr. Warfield; I did not get the note back; I saw Mr. Bannon several times

about the matter, but never got the note; Mr. Warfield called to see me; saw me two or three times out of the presence of Mr. Bannon; I think he inquired about Dr. Revell's affairs, before he and Mr. Bannon came together; * * * *

Thomas J. Pitt, being examined on the part of the defendant, testified as follows: In October, 1868, I was the clerk and book-keeper of Mr. Bannon, at his office, in Baltimore, and am so employed now; the plaintiff, was at the office in 1868; I recollect Mr. Bannon telling him he had a party applying to borrow money, and he asked Mr. Warfield if he had any to lend; Mr. Bannon described the property to him; after Mr. Bannon explained to him about the property, he said he might lend it if he thought the property would bear it; if Mr. Bannon thought that in his judgment the property would bear the loan of $1500, then he was to make the loan; it was to be loaned to Dr. Revell; this is about all I remember about it; I have seen the note sued on before, and recollect when it was given; I was present when the $1440 note was delivered to Mr. Warfield, to be held by him until the mortgage and note of Dr. Revell were delivered to him by Mr. Bannon, then this note was to be given up, this is as well as my recollection serves me; I have been present at the office several times when Mr. Warfield made inquiries whether any interest had been collected on Revell's mortgage debt; I recollect on one occasion Mr. Bannon I think asked Mr. Warfield to deliver to him the note, that he had the mortgage note to deliver to him; I don't recollect that Mr. Bannon said anything else; I don't remember what reply was made by Mr. Warfield.

Being cross-examined he said, I remember Mr. Bannon telling Mr. Warfield where the property was located, but don't now recollect the place; I can't say whether I took the note sued on out to Mr. Warfield to Howard County; I got Attrill's note; it was after the conversation

about the loan to Dr. Revell, that I went to Warfield's; did not take Attrill's note to Bannon; I don't think I took the note in suit out; I gave him nothing and brought nothing back. * * * *

The plaintiff being examined in rebuttal, testified as follows: The loan to Attrill was made 19th September, 1868, this was money that Mr. Hammond had borrowed from Miss Rachel Warfield; it was paid back to Miss Warfield, and after she had received it Mr. Bannon came to my house one night, and talked with her and she agreed she would lend it to Mr. Attrill; the next morning Miss Rachel said she had concluded not to lend the money as it was so far off; being unwilling to disappoint Mr. Bannon I said I would give my note to Miss Rachel, and take Attrill's note and mortgage in my name; Mr. Bannon informed me not more than a month after, that Attrill had returned the money and said he had a friend in Anne Arundel County who wanted to borrow it; I don't know where this interview occurred; it was after the date of a letter from him of December 3rd, 1868; [the plaintiff here offered in evidence a letter of that date from the defendant; requesting him to bring Attrill's note for $1500 to Baltimore, or send it by mail, and he would at once forward another for the same amount and of the same date, &c. And the letter would be a sufficient satisfaction until he forwarded the other.]

I saw Mr. Bannon two or three days afterward at the Junction, and told him I had received the letter, but could not think of sending Attrill's note on such a letter without I was secured, and he said he did not expect me to do so, that he would secure me; I said if a mortgage was taken it must be in Miss Rachel's name; he said the place was in Anne Arundel County, but I don't remember his mentioning the name of any person as the borrower; he said it was a good farm, a fine place, &c., but said nothing about its value; he was pressed for time and went off in

the cars; this was the first time he ever said anything about lending this money in Anne Arundel County; I told him, then, that as the land was near at hand, the mortgage should be taken in Miss Rachel's name; on the 9th January, Mr. Pitt came to my house and brought this $1440 note; I said it was $60 short of the amount, and I could not let Attrill's note go for that; he said Mr. Bannon was good for it, and would give another note for $1500 or the $60; that Bannon was bound as endorser, and had plenty of property; I gave him Attrill's note, and he gave me J. Revell's note for $1440; I made a memorandum at the time on a piece of paper; (this memorandum was produced, and read by the witness.)

This was at my house, and not at Bannon's office; I never knew at that time, but that the $1440 note was the mortgage note; I don't think anything had been said up to this time, as to who was to have the money, or that I had heard Dr. Revell's name mentioned up to this time, but concluded then that J. Revell was to get it; pretty soon after this I saw Mr. Bannon; can't say exactly when; he gave me no other note, he said this was good; he said the loan was to Dr. Revell, and that he had a very fine farm, &c.; I told him the mortgage must be in Miss Rachel's name; I called on him for the $60, and he told me to hold on to this note until he gave me another; he never offered me another note or the mortgage; he never asked me for this note in his life; he said James Revell was good; we never had much talk about it until the interest became due and I went to see Bannon; he always told me to hold on to this note; I never saw the mortgage or note of Dr. Revell; when I asked him about the mortgage, he said J. Revell had made a mistake in drawing the mortgage, that it should have been drawn to Miss Rachel; * * * * * Bannon promised me twice to confess judgment on this note; the note never was denied by Mr. Bannon at all; Mr. Revell never told me anything about

this note; the only time I ever heard him say anything about it, was when I told him I was going to sue; he said he had nothing to do with it, and was not bound to pay it; I asked Bannon for a note for $1500, and he told me to keep quiet, that all were bound on this note; I never authorized Mr. Bannon to lend $1500 for me to Dr. Revell; I never authorized him to make affidavit to the mortgage for me; Bannon never presented or showed to me, or offered me Dr. Revell's note or mortgage; he said this was all good; I never had Dr. Revell's note or mortgage in my possession; never saw or heard of them; I told Mr. Bannon and Mr. Revell, the last time I had an interview with Mr. Revell, that I would sue them; it was in Revell's office; after we came out, he said I had better not sue, that he would come up and fix it with Miss Rachel, that he considered himself bound for it. The note I agreed to extend for twelve months if they would pay up the bonus and interest, was this $1440 note. That was in Annapolis. Mr. Bannon never demanded the note from me in his life in the presence of Mr. Pitt, or of any one else. He always said he would pay it. I never borrowed any money from him in my life. I never approved of the Revell loan, nor did I ever ratify it.

The witness being cross-examined, testified as follows:

I don't recollect that anything was said at the Junction about Dr. Revell or Mr. Revell. I said if I lent any money on the property which he told me was good, it must be for Miss Rachel, and in her name. I did'nt tell Mr. Bannon to put it out. Bannon had told me he considered himself Miss Warfield's agent. I heard of Dr. Revell at Bannon's office, after I received this note for $1440, and I said again the mortgage must be in her name. Bannon had never before invested any money for me. The loan to Attrill was for $1500, on his note and mortgage for twelve months from September 19th 1868. * * * I can't say when I first heard Dr. Revell's name mentioned.

* * * * Before 3rd December Bannon had told me that a man with a good farm in Anne Arundel County wanted the money. I don't remember whether he mentioned Dr. Revell's name or not. I first heard the name Revell when Bannon sent me the note of James Revell on the 9th of January, 1869. Correcting himself, the witness said, Bannon told me at the Junction, that the person who wanted to borrow the money, was named Revell. When Pitt took the note from me, I had heard nothing of Revell. When I told him that the mortgage must be in Miss Rachel's name, he told me ⌐at the Junction, it was to be a mortgage of Revell. * * * Mr. Bannon never told me that he had taken this note from Mr. Revell on the condition that it was to be given up for Dr. Revell's note and mortgage. On the contrary, I was to hold on to it until he could get it fixed for Miss Rachel ; I never heard of the agreement nor anything like it between Messrs. Revell and Bannon until this trial ; James Revell told me when I said I would sue them, he only got it for his brother, and that was the way he had given his note, but I did not understand then that there was an agreement.

The defendant further proved by James Revell as follows :

Mr. Warfield never said he would extend the note signed by me for another year ; he never made a demand on me for the payment of the $1440 note ; he said he would sue on the note ; I never said this $1440 note should be paid ; I said Dr. Revell's note ought to be paid.

Upon all the evidence in the cause, the plaintiff offered seven prayers, the third and fourth of which as follows, the Court (HAMMOND and HAYDEN, J.,) granted, the others were rejected :

3rd. Although the jury may believe that James Revell signed the note sued on, and the defendant endorsed the same, upon the condition testified to by the defendant, yet the existence of such condition cannot operate to impair

the liability of the defendant in this action, unless the jury shall believe that the plaintiff accepted the said note with full knowledge of said condition, or unless they shall believe that the plaintiff was afterwards made acquainted with said condition, and thereupon agreed to hold the said note subject to the said condition.

4th. That the advance of the $1440 to Dr. Revell by the defendant, and the reception by him of the $1500 note, and the mortgage from Dr. Revell, cannot operate to exonerate the defendant in this action, unless the jury shall believe that the plaintiff previously authorized the defendant, as his agent, to invest his money in said note and mortgage for his account, or that the plaintiff, after he was informed of said investment, approved of or accepted the same, with full knowledge of all the facts as to the value of the property, and the extent of the liens thereon.

The defendant offered seven prayers, all of which the Court granted except the fifth as follows, which it rejected:

5th. If the jury find that the defendant as agent for the plaintiff made an examination of the property of Wm. T. Revell on which the mortgage offered in evidence was executed, and examined the records to ascertain the liens on the said property as testified to by him, and from such examinations became satisfied that the sum of $1500 could be safely invested on said land, then the jury are not to consider the valuation put upon said land by other witnesses in determining whether the defendant acted with proper discretion in lending the said money on a mortgage on the said land as offered in evidence.

The defendant excepted to the rejection of his fifth prayer and to the granting of the third and fourth prayers of the plaintiff. The verdict and judgment were for the plaintiff and the defendant appealed.

The cause was argued before BARTOL, C. J., STEWART, ALVEY and ROBINSON, J.

*William H. Tuck*, for the appellant.

The third and fourth prayers of the plaintiff ought to have been rejected. It is not contended by the appellant that the mere taking by him of the note of James Revell, on the terms stated by them, would *per se* discharge the defendant, as indorser of the note. It was not in contemplation of Bannon or Revell that Warfield would ever hold this note. The question is not whether Revell and Bannon had any understanding on the subject, which was made known to Warfield, but whether, when Bannon passed the note to Warfield, he, Warfield, understood that it was to be returned on receipt of the other note and mortgage. Therefore it was of no consequence whether Warfield accepted the note with full knowledge of said condition, (between Bannon and Jas. Revell,) or not. If no such arrangement between them had been made, or if Revell's note had been passed to Bannon, or any other consideration, or if Bannon had held any other person's note for that amount, and passed it to the plaintiff temporarily, he was entitled to have it returned, on the receipt by the plaintiff of the other note and mortgage, even if Warfield had never heard of James Revell as acting for his brother in negotiating this loan, or had never known on what terms he had passed his note to Bannon.

The objection applies to the latter branch of the third prayer, for if the plaintiff agreed to return this note on receipt of the other note and mortgage, as proved by Bannon, his being acquainted with the arrangement between Bannon and Revell, had nothing to do with the question.

According to this third prayer, the jury were to find against the defendant, on either of these views, ignoring all else in the cause that was offered to them, that in equity and conscience the plaintiff had no just claim against him, no matter how fully satisfied the jury might have been, that the defence, on other points, had been established. *McTavish vs. Carroll*, 7 *Md.*, 366; *Fulton*

vs. Maccracken, 18 Md., 528 ; Parkhurst, et al. vs. Northern Cent. R. R. Co., &c., 19 Md., 472 ; Md. & Del. R. R. Co. vs. Porter, 19 Md., 458.

In view of this latter clause, the defendant could not have obtained a verdict, although the jury might have been satisfied that the plaintiff had, after he got this note, agreed tó return it, on receipt of the other note and mortgage, unless they also found that he knew of the terms on which Revell had given his note to defendant, and agreed to hold it subject to such terms ; that is, that as between Bannon and Revell, the latter was to have his note back when he sent Bannon the other note and mortgage.

The fourth prayer concedes that the advance of $1440 to Dr. Revell and the reception by the defendant of the note and mortgage, would operate to discharge him if Warfield authorized the investment to be made or afterwards approved of or accepted the same—(the note and mortgage) with full knowledge of all the facts as to the value of the property, and the extent of the liens. The conditions of this prayer were not warranted by the facts of the case, but were opposed to them. Mercer vs. Walmsley, 5 H. & J., 32, 33 ; Riggin vs. Patapsco Ins. Co., 7 H. & J., 295.

If Bannon were acting as agent for Warfield in lending and collecting his money, he needed no special authority in this instance, yet the prayer requires the jury to find, as one alternative, a previous authority to invest his money in this note and mortgage.

If there were was no authority to make this investment, then by the prayer the jury were to find that the plaintiff approved of or accepted the same—(the note for $1500 and mortgage) with full knowledge of all the facts as to the value of the property and the extent of the liens thereon. Now, while it may be conceded that there can be no approval without knowledge, it does not follow that the plaintiff should have been informed of all that this prayer assumes to be necessary.

According to the only evidence in the cause on this question, the value of the land was to be determined by Bannon alone. Pitt proves that Warfield said Bannon, might lend the money if he thought the property would bear it; if in his judgment the property would bear the loan of $1500, then he was to make the loan. That it was Bannon's judgment and not Warfield's approval that was to be the guide. For the same reason he had nothing to do with the liens, for the authority to invest, if Bannon thought the property would bear it, included the duty of examining the records and ascertaining the incumbrances.

This prayer and the third also ignored the fact that the note was over-due when endorsed to the plaintiff, and that he was bound by all previous equities affecting it, for if Bannon had not parted with it, Revell was entitled to its possession, when he sent his brother's note and mortgage; and even as between Warfield and Bannon, if the evidence of Bannon is to be credited, and that by the prayer ought to have been left to the jury, Warfield could hold this note only " to show where his money was," until the note and mortgage were sent to Bannon ; and as soon as informed that Bannon had received these, his title to this note ceased, and Bannon or Revell might rightfully have demanded the surrender of it, without reference to the approval by Warfield of that arrangement.

Again, according to the prayer the jury were to find that Warfield *accepted* the note and mortgage, when the evidence shews that he never had them at all, and was not to have them, for he had told Bannon to hold the note and to have the mortgage recorded. A prayer is erroneous which requires the jury to find a fact in the face of the only evidence offered on that part of the case. *Riggin vs. Patapsco Ins. Co.*, 7 *H. & J.*, 295 ; *Mercer vs. Walmsley*, 5 *H. & J.*, 32.

The fifth prayer of the defendant ought to have been granted. There was evidence tending to show that this

loan had been made by Bannon, by authority of the plaintiff, provided he, Bannon was satisfied of the sufficiency of the land to bear it, which included the value of the property and extent of the liens, to be ascertained by him and no one else; yet the Court, by rejecting this prayer, and granting the *fourth* of the plaintiff, made this defence depend, not on Bannon's judgment, but on the opinion of others as to the value of the land.

There is no suggestion of fraud or bad faith on the part of Bannon. He must be presumed to have acted in the exercise of an honest judgment and sound discretion, according to the best information he could obtain, and without negligence. The law gives every agent the benefit of this presumption. *Gaither vs. Myrick,* 9 *Md.*, 118.

*Alex. B. Hagner* and *Alex. Randall,* for the appellee.

The only ground upon which the alleged agreement between James Revell and Mr. Bannon, can affect the plaintiff's right to recover, would be that the plaintiff received the note *with express notice and actual knowledge* of the agreement and understanding upon which it was made and endorsed; or that the plaintiff was afterwards made acquainted with the agreement, and thereupon assented to hold the note subject thereto. *Ricketts & Whittington vs. Pendleton,* 14 *Md.*, 329.

The third prayer of the plaintiff simply states this clear proposition in language not materially different from that employed in the first and third prayers which were granted at the request of the defendant himself.

In the same manner the plaintiff's fourth prayer stated an unquestionable proposition, viz: That unless the plaintiff had previously authorized the defendant as his agent, to invest the money in the note and mortgage for his account, *or* with full knowledge of all the facts as to the value of the property and the extent of the liens thereon, after he had been informed of the investment, approved of

or accepted the same—then the advance of the $1440 to James Revell by the defendant, and the receipt by him of Revell's note and mortgage, could not exonerate the defendant.

The defendant's first prayer, granted by the Court, tendered the same issue to the jury, who were the proper judges as to the existence of the agency under the evidence, and of the plaintiff's approval or acceptance of what the defendant professed to have done. *York Co. Bank vs. Stein, et al.,* 24 *Md.,* 466 ; *Henderson vs. Mayhew, et al.,* 2 *Gill,* 409.

The defendant's fifth prayer was clearly faulty. According to the theory of this prayer the defendant's judgment as to the value of the property and the security of the loan, was to be regarded as infallible, although the whole world might think the property was not worth the tithe of the mortgage debt ; or although the title should prove to be worthless ; or numerous liens should be disclosed which the agent and attorney had not discovered in his examination of the title.

As the jury found that the defendant was not the agent of the plaintiff, the defendant was in no degree injured by the refusal of this instruction, which could only avail the defendant in the event of the jury finding the existence of the agency.

ALVEY, J., delivered the opinion of the Court.

This is an action by the appellee as indorsee of a promissory note, drawn by James Revell on the 8th of October, 1868, payable to the order of the appellant, ten days after date, for $1440, and by the appellant indorsed to the appellee.

The pleas were, never indebted and never promised, as alleged, and that the cause of action did not accrue within three years before suit brought.

The making and endorsement of the note were admitted. The appellee then gave evidence of payments on the note

by the appellant, for the purpose of removing the bar of the Statute of Limitations, and thereupon rested his case.

The appellant then gave evidence tending to prove that he was the agent of the appellee, for the investment of his money in the particular case, and that the promissory note in controversy was indorsed by the appellant and transferred to the appellee only· as a temporary security for the money which the appellant was authorized to invest for the appellee;· the agreement and understanding being, according to the evidence of the appellant, that the note should be surrendered to him upon his procuring the proper security by note and mortgage from the party to whom the money was loaned, and delivering the same to the appellee.    Whether the note in controversy was indorsed and delivered to the appellee for the· purpose and under the agreement stated and insisted on by the appellant, became a leading question in the cause, and in reference to which the evidence as given by the parties was quite conflicting.

The appellant, deeming it essential to his defence to show that the investment of the money was judicious, and secured by mortgage of a farm of adequate value, offered evidence by himself, and another witness, of the value of the farm in the fall of 1868, the time when he made the loan, as he contends, for the appellee.    After the appellant had closed his evidence, the appellee, in reply, gave evidence to countervail or rebut that offered by the appellant in respect to the value of the farm, by proving that, in 1868 and 1869, the farm was of less value than the estimate placed thereon by the appellant and his witness. Whereupon the appellant, after the appellee had closed his evidence, in reply, offered to prove by other witnesses than those previously examined, the value of the farm in 1868 and· 1869 ; to which the appellee objected, and the Court sustained the objection, and excluded the evidence

thus offered ; and this ruling forms the subject of the first exception by the appellant.

The question here presented is one of practice, and relates to the orderly manner in which parties are required to introduce their evidence in support of the issues to be tried.   The observance of fixed rules upon the subject is of great importance, not only as means of avoiding confusion, but to the fair administration of justice.   Much of course depends upon the form of the issues joined, and upon whom the *onus* rests.   The parties must not be allowed to break up the evidence they may intend to offer on any particular issue, and introduce it at different stages of the cause in piece meals, as the varying emergencies of the case may seem to require.   Such practice would not only greatly prolong trials, but would frequently lead to surprise and injustice.   According to the well established practice, the plaintiff, having the right to begin, must put in the whole of his evidence upon every point or issue which he opens, and the defendant then puts in evidence his entire case ; and in reply the plaintiff is limited to such new points and questions as may be first opened by the defendant's evidence.   1 *Greenl. Ev.*, sec. 469 a. (12 *ed.*)   From this general rule there may be departures to meet the requirement of particular cases ; but the entire question, as to the mere order of proof, and under what circumstances evidence should be admitted or rejected when offered out of the proper order, in the absence of some positive rule of Court upon the subject, must be allowed to rest in the discretion of the Court directing the trial, as the tribunal best qualified to judge what the justice of the case may require in these respects ; and hence from the rulings on such questions no appeal will lie.   *Phil. & Trenton R. Co. vs. Stimpson,* 14 *Pet.*, 448, 463 ; *Salmon vs. Rance,* 3 *S. & R.*, 311, 314 ; *Duncan vs. McCullough,* 4 *S. & R.*, 482 ; *Frederick vs. Gray,* 10 *S. & R.*, 182 ; 4 *Phill. Ev.*, *Cow. & Hill's notes, p.* 708.

Here the *onus* of proof of all the facts necessary to constitute a discharge from, or to avoid, the liability created by the endorsement of the note, was upon the appellant; and having gone into his proof in respect to the value of the farm, he was bound to offer all his evidence upon that subject before he closed his case, and the appellee was allowed to offer rebutting evidence. If, therefore, this were a question proper for review by this Court, we should not hesitate to declare our full assent to the ruling of the Court below as presented by this exception.

But it is contended that, as the appellant confined the evidence offered by him to the value of the farm in the fall of 1868, the evidence offered by the appellee enlarged the inquiry in point of time, by referring to the value of the farm in 1869, as well as in 1868, and that, therefore, he ought to have been allowed to rebut the appellee's evidence as to the value in 1869. To this, however, it may be answered, that the only purpose for which reference could have been made to the value of the farm in 1869, was to fix the value in the fall of 1868;—for any other purpose it was wholly immaterial. If the evidence was immaterial it ought to have been dealt with otherwise than by rebutting it. It is a well settled rule of evidence, that the introduction of improper or immaterial evidence on one side does not justify the introduction of irrelevant matter on the other; *Walkup vs. Pratt,* 5 *H. & J.,* 56; *Mitchell vs. Sellman,* 5 *Md.,* 385; and here the value of the farm in 1869, except as it would be evidence of its value in 1868, the time when the loan was made to its owner, was quite irrelevant.

The second exception taken by the appellant was to the granting of the third and fourth prayers, in a series of seven, offered by the appellee; and to the refusal of the fifth prayer, in a series of seven, offered by the appellant. All the other prayers on the part of the appellee were rejected, and all those on the part of the appellant, except the fifth, were granted by the Court.

By the appellee's third prayer the jury were instructed that, although they might believe the note sued on was made and delivered to the appellant, and that he endorsed the same, upon the terms and conditions testified to by him, yet the existence of such condition could not operate to impair the liability of the appellant as endorser of the note, unless the jury should believe that the appellee accepted the same with full knowledge of such condition, or unless he was afterwards informed of such condition, and thereupon agreed to hold the note subject thereto. As we understand this instruction, the condition referred to was that upon which the appellant testified he had accepted the note from the maker, and not that upon which the note was endorsed by the appellant to the appellee. The prayer in this respect is not as clear as it ought to have been. But its context would seem to indicate our understanding of it to be correct; and so it has been understood by the appellant, as shown by the argument in his behalf. The prayer, however, puts no hypothesis of facts to exclude the appellant from the full benefit of his defence. It does not conclude that, if the jury should fail to find that the appellee had knowledge of the condition at the time of the endorsement, or that he afterwards acquired knowledge, and agreed to hold the note subject to such condition, he was therefore entitled to recover. The prayer presents rather an abstract proposition, and appears to have been intended to define and limit the legal effect of the condition upon which the note was said to have been made to the appellant. But this being an action founded upon the appellant's endorsement of the note, and that endorsement making no manner of reference to the condition upon which the note was made to the endorser, and being in no way restricted or qualified, it is not very apparent how such condition could affect the appellee's right to recover on the endorsement against the appellant. The latter's defence, as we understand it, was

that the endorsement of the note to the appellee was upon certain terms and conditions, which, having been complied with by the appellant, relieved and exonerated him altogether from any liability by reason of the endorsement. If such be the case, the third prayer of the appellee gave to the appellant the benefit of a condition upon which his liability did not depend; for the prayer might well be taken as a concession by the appellee that if the facts therein referred to were found by the jury the verdict should be for the appellant. We think, therefore, there is nothing in this prayer of which the appellant has just cause to complain.

And as to the fourth prayer of the appellee, that would seem to be free from objection. According to the theory and the evidence of the appellant, he could be exonerated from liability by reason of the endorsement of the note only upon his satisfying the jury that he had acted as the agent of the appellee in making the investment of the money, and in taking the note and mortgage as security therefor. If there had not been previous authority delegated, in order to bind the appellee, it was necessary to show that he had subsequently ratified and adopted the acts of the appellant, in making the loan and taking the security. To make such ratification and adoption effectual, as against the appellee, it was essential that he should have had previous knowledge of all the material facts; *Adams' Express Co. vs. Trego,* 35 *Md.,* 69; *Bell vs. Cunningham,* 3 *Pet.,* 81; *Owens vs. Hull,* 9 *Pet.,* 607; and if he assented while ignorant of those facts he was at liberty to disaffirm the transaction when informed of them. *Copeland vs. Merchant's Ins. Co.,* 6 *Pick.,* 198. The value of the property and the extent of the incumbrances thereon were certainly material facts to be known, in making up a judgment as to the sufficiency of the security to be taken for the loan; and if the security was insufficient, and the appellee was not informed upon the subject, or was deceived

in regard thereto, by the appellant, at the time of the supposed ratification, then such ratification, in the absence of all previous authority, would not be effectual as between the appellant and the appellee, except at the option of the latter.

It has been strongly contended in argument, that these prayers, granted on the part of the appellee, are susceptible of different interpretations, and that they were, owing to their peculiar structure, well calculated to confuse and mislead the jury, and to deprive the appellant of the benefit of the instructions granted by the Court at his instance. But we have not so construed them. If they had been the only instruction granted in the cause, then there would have been some ground for the criticism of the appellant. But the record contains all the prayers which were granted, as well those on the part of the appellant as those on the part of the appellee; and from an examination of those granted at the instance of the appellant, we find that the jury were fully and explicitly instructed, and that too most favorably to the appellant, in reference to all the facts upon which he relied in defence. Such being the case, we can discover nothing in these prayers of the appellee that would likely mislead or confuse the jury, in considering the case under the instructions given at the instance of the appellant. The party appealing should in all cases be able to show, from the record, that he has sustained real injury by reason of the rulings of the Court below, which form the ground of the appeal; and where this Court can see that the trial below was fairly conducted, and that the law of the case was fully and substantially applied,—the appellant obtaining the benefit of all the law to which he was entitled, or which he sought to obtain,—there can be no good reason for reversing the judgment for matters immaterial, or upon mere refinements as to the terms in which propositions have been submitted to the jury. To justify a reversal

there must be substantial error apparent, and that to the prejudice of the appellant.    If instructions be ambiguous, or susceptible of different interpretations, the party liable to be affected by them, should avail himself of his right to have that which may be doubtful made clear and certain, by more explicit instruction.

As to the fifth prayer of the appellant, which was refused, we think there was no error in such refusal. That the appellant acted in good faith and with reasonable care, in the execution of the authority, or in observing the instructions of his principal, in making the loan and taking the security, were facts which appear to have been assumed throughout as material to the defence, and hence proof was given upon the subject.    If the value of the farm was very much less than the estimate placed thereon by the appellant, that was a fact reflecting on the question of the want of good faith and reasonable care in making the loan and taking the security.    The real value of the farm, moreover, was material and proper to be considered by the jury, in reference to the question of ratification, submitted to them by the appellant's fourth prayer, and also by the fourth prayer of the appellee.

It follows that the judgment must be affirmed.

*Judgment affirmed.*

(Decided 10th March, 1875.)