Mr. Justice Hag-ner
delivered the opinion of the Court:
The plaintiff was the owner of a dwelling house in Le Droit Park, about 100 feet distant from Sixth street. The *599 dwelling was connected with the main Sixth street sewer by a supplemental sewer. At the southwest corner of the cellar the latter sewer was entered by the house sewer, which.had its origin in the northeast corner of the cellar and ran diagonally under the floor to' the southwest corner, where it entered the supplemental sewer. The plaintiff testified that before 1884, an arrangement existed by which the rain-water from the roof descended by a pipe to the level of the cellar ceiling; and thence, by a galvanized pipe, it was conducted across the cellar ceiling to the northeast corner, and there by a down pipe entered the house sewer; that about this time he became suspicious of the soundness of this- galvanized pipe, and he employed the defendant, who is a plumber, to sever the connection between the rainwater spout and the house sewer; to conduct the rain-water to a well in- the back yard by an iron pipe outside the house; and also to close effectively the former entrance by which the rain-water entered the house sewer. The defendant and his workmen broke the counectiomat the bottom of the rain-spout; laid the iron pipe to carry the rain-water to the well in the back yard ; removed the galvanized pipe from the ceiling of the cellar, and took it away; and broke the connection of the rain-water spout with the house sewer in the northeast corner of the cellar, and undertook to close the entrance to the house sewer.
He further testified that he was anxious to superintend the entire work, but when he reached 'the house he found the work in the cellar had all been completed, and the earth replaced where the workmen said they had closed the entrance to the house sewer. Soon his family began to fall sick and he detected the smell of gas in the cellar. He communicated with the defendant on the subject; but made no complaint about the work in the northeast corner of the cellar because he supposed that job had been well done. He first thought the smell arose from some defect in the fixtures belonging to the illuminating gas; and he *600 .had them examined. Finally, however, he became apprehensive there was something wrong about the sewer, and he arranged with the defendant to put a running trap outside of the house. This work, however, was put off to suit the defendant’s convenience. The sickness continued and finally one of his children died of diphtheria, and his wife and children, and he himself, were ill with the same symptoms. Unwilling to wait longer, he sent for Hannan, another plumber, who examined the gas arrangements and found nothing wrong there; and he engaged to come on the 9th of October to examine the sewer connections and do whatever was essential to rectify the evil.
The night before Hannan was to come the plaintiff went down in the cellar communicating with the furnace cellar, which he frequently entered to attend to the furnace, carrying with him a strong liquid disinfectant. Although he had no idea there was anything wrong about the connection at the northeast corner, he thought the soil there might possibly be impregnated with sewer gas from former leakages, and to remedy that possible danger he poured the liquid down in the corner on the asphalt, and stepped back, thinking it might splash on him ; but to his surprise it all disappeared with a gurgling sound, showing there was an opening there. When Hannan came he communicated the fact to him. Hannan then made an excavation and found the opening where the rain-spout had entered the house sewer had not been properly stopped up, and that it was then open, and, on examining the side of the pipe next to the wall, he found a V‘s^aped piece broken out, about 2 indies wide at the top and running downwards to 4 inches in width. As soon as they applied their olfactories to the point they became convinced that was the source of the trouble. Hannan took up all the bad work and sealed up the opening properly. All this work was completed on the 9th of October, but the running trap into the outer sewer was not put in place until the 10th of October.
*601 He further testified that from the time the opening was sealed up by Hannan and the gravel and concrete had been replaced in the northeast corner all smell of sewer gas ceased; and since that time there has been no further trouble from sewer gas in the house. From that time forth his family improved in health, although he himself had not entirely recovered. The plaintiff brought this action to recover damages for the injury sustained by himself and family from the unskillful work performed by the servants of the defendant in failing to close properly the opening into the house sewer, which formerly admitted the galvanized pipe.
There was a good deal of evidence on the other side disputing many of these points. In the first place, the defendant denied that he was employed to close that opening at all, or that his workmen attempted to close it; and he showed his bill, which referred apparently to outside work and not to work in the house. Next, he insisted that the sewer gas did not proceed necessarily from that opening, since there were several other defects in the original arrangement of the sewers, either of which might equally well explain the presence of gas. First, that it was'a gross defect that no running trap had been placed outside of the house to prevent the regurgitation of sewer, gas or odors from the town sewer into the house. Next, that the drainage pipes from the rear kitchen and from the water closets came down to the cellar and there entered the house sewer, and that between these pipes and the southwest corner of the cellar there was what is called a bell-trap opening into the cellar, which was very imperfect, and would allow the escape of odors when not filled with water; and it was in proof that at one time, at least when Hannan went there, there was no water in it; and he claimed that either of these defects was more likely to cause the escape of gas than the broken pipe.
The plaintiff offered one prayer, which was granted. The *602 defendant offered eight. The court refused the first seven, and granted the last one in these words:
“The jury is instructed that in order to entitle the plaintiff to a verdict the jury must be satisfied from the evidence — first, that the work complained of in the declaration and specified in the evidence as the alleged cause of damage complained of, was part of the work undertaken by the defendant; secondly, that such work was in fact defectively done; thirdly, that by reason of such defectiveness in the work, and such alone, the vapors and gases complained of escaped into the-dwelling house of the plaintiff; and lastly, that such vapors and gases were the exclusive cause of the several illnesses and ailments of the plaintiff and his family, alleged in the declaration, or some of them.”
This was a most exhaustive. statement of the requirements of the situation, and would seem to have been all that the defendant could possibly ask. The jury having found a verdict for the plaintiff, we are asked to reverse and grant a new trial upon the ground that the verdict was not justified by the evidence. We have the right to adopt this course under the decision of the Supreme Court in the case of Moore vs. Metropolitan Railroad Company; but that court laid down the rule which this court has .applied in Fisher vs. Hume, 6 Mackey, 9, that although this power exists, it is one which will be exercised with great caution; where the judge below, who heard all the testimony, saw the witnesses and observed their demeanor and was thus better able to judge of their intelligence and bearing, and heard the arguments, was of the opinion that the jury was j ustified in the verdict. Whenever the appellate court sees there were assumptions of facts in an instruction, not justified by the proof, it should exercise this power. But upon each of the points presented by the instruction there was evidence on both sides. The eighth prayer left it to the jury to decide, first, whether the work complained of and specified in the evidence as the alleged cause of damage, was a *603 part of the work undertaken by the defendant. Although this was denied by the defendant, yet Herbert, his paid servant, who never was employed by the plaintiff, testified that he took down the galvanized pipes in the house and actually undertook to close the opening into the house sewer in the cellar. Indeed, upon all the proof, there can be no doubt the jury were fully justified in finding, what seems certainly most reasonable, that the defendant was employed by the plaintiff to do this verjf work; and that his servant undertook to do it. That the plaintiff should deliberately have left such a hole unclosed is inconceivable.
Second, the jury was required to find that the work was, in fact, defectively done. There was certainly evidence to that effect. The large piece in the connecting pipe had evidently been broken out by Herbert’s carelessness, and the top of the pipe was not even closed. The third essential to a recovery, as laid down in the instruction, was that the jury should find that by reason of such defectiveness in the work, and that alone, the vapors and gases complained of escaped into the dwelling house of the plaintiff. The defendant’s counsel argued before the jury, as they did here, that there were several other causes which might equally well have accounted for the escape of the sewer gas. The jury, who were required to consider both theories, took a different view of the probable cause from that maintained by the defendant, and there was evidence to justify this conclusion. Lastly, the jury was required to determine before they could find for the plaintiff “that such vapors and gases were the exclusive cause of the several illnesses and ailments of the plaintiff and his family.” The jury found such was the case, and we cannot hesitate to say there was testimony to support that finding. It is, therefore, clear this is not a case where we could undertake to set aside the verdict on the ground of insufficient evidence.
We have examined the seven preceding prayers and are very well satisfied the court was right in rejecting them all. *604 The first four relate to the form of the pleading, as do the reasons assigned in support of the motion in arrest of judgment. They present the objection that the declaration does not, in either count, sufficiently state a contract between the plaintiff and defendant. We are satisfied this is a-mistake, and that the declaration sufficiently makes such a statement in each count.
After the plaintiff had closed his case in chief the' defendant moved fhe court to instruct the jury that the plaintiff was npt entitled to recover upon the evidence thus adduced ; and that instruction was refused. The defendant then proceeded to offer his evidence. The propriety of that refusal has been argued her'e. We are satisfied the point cannot be considered in this court under the circumstances. This has been decided by this court, and by the Supreme Court in The Insurance Company against Crandal, in 120 U. S., where the facts were very much like those in the present case. There, after the plaintiff had rested his case, the defendant asked the court to take the case from the jury, and the' motion was refused. The defendant then introduced his evidence and the verdict being against him, he attempted in the Supreme Court to take advantage of the alleged error of the trial couiit in not granting the prayer at the time it was made; but the Supreme Court refused to consider the objection, holding it had been waived by the defendant when he decided to proceed with his testimony, instead of standing on his demurrer to the plaintiff’s evidence. There is nothing in the remaining prayers requiring special notice; and it is sufficient to say the}'' were all properly refused.
There, were several objections to the rulings of the court as to the evidence. The first is to this statement of the plaintiff on redirect examination. “When he discovered this opening in the terra-cotta pipe he came to the conclusion that it was a sufficient cause to account for all the sickness that they had had in his family,” The difficulty *605 here is that the exception does not point out upon what ground the objection was made. The courts have uniformly held that an exception taken to a mass of evidence without specifying the ground on which the objection is based, will not be examined by the appellate court; and in such case, if •it appear the testimony is admissible for any purpose, its admission by the court will, be considered proper. The Supreme Court uses this language in considering such an exception: (3 How., 530.) “With regard to the manner and the import of this objection, we would remark that they were of a kind that should not have been tolerated in the court below pending. Upon the offer of testimony, written or oral, extended and complicated as it may often prove, it could not be expected, upon the mere suggestion of an exception, which did not obviously cover the competency of the evidence, nor point to some definite or specific defect in its character, the trial of the issue before the jury, that the court should explore the entire mass of evidence for the ascertainment of defects, which the objector himself either would not or could not point to their view.” We ap- . plied this rule in Woodbury vs. District of Columbia, 5 Mackey, 134.
Some of these exceptions are based upon the-allegation that the court allowed the plaintiff to introduce evidence by way of rebuttal which ought to have been introduced in chief. The settled rule on that point is that the admissibility of such evidence is entirely a matter of discretion in the court. In Bannon vs. Warfield, 42 Md., 39, after the defendant had closed, the • plaintiff produced additional evidence, which was objected to upon the ground that it should have been offered in chief, but the court overruled the objection, and admitted the evidence. Then the defendant offered further evidence, which the court refused to admit, upon the ground that it should have been offered in chief. The defendant excepted to both rulings, contending that the plaintiff should not have been allowed to introduce his supplemental *606 evidence, but that since he had been permitted to do so, the same privilege should have been allowed to the defendant. The appellate court held that each ruling stood upon its own circumstances, and that the entire subject was in the discretion of the court, and its decision in such cases was not a matter of appeal.
The two exceptions to the testimony in behalf of the plaintiff as to the value of his business before he was taken ill, and its diminution after his illness, present general objections to a large mass of testimony, some parts of which were certainly free from all objection. Since the exception does not point out the particular part objected to, the ruling must stand, under the rule announced above iii 3 Howard. Indeed we see nothing objectionable in any part of the offer. The objection to the testimony as to the value of plaintiff’s business before his illness was properly overruled. We so decided in Woodbury vs. District of Columbia in 5 Mackey. There a physician sued for damages resulting from falling down an unprotected opening in a pavement, and he was permitted to prove that he had a large practice, and its value, and, furthermore, that he was a contributor to magazines and had lost seriously by being incapacitated from continuing that work.
The last exception was to the admission of the testimony of Conrelia Lucas, who stated that she knew the custom of the plaintiff was to keep the bell-trap in the cellar supplied with water, and when the plaintiff himself did not supply the water it was her duty to do so, and she saw to it herself. It was insisted, first, that this testimony should have been offered in chief, and further that it would not have been admissible evidence at any stage of the case. We are of opinion it was admissible, and the question whether it should be introduced in chief was solely in the discretion of the trial justice.
On the whole case we are persuaded, after full examina,tion, that justice was done,' and there is no ground of rever *607 sal. Tlie following language used in Bannon vs. Warfield seems to be worthy of notice. There the appellant had offered prayers which had not been granted by the court below, and although the court held some of the rulings below were wrong, yet they said:
“ The party appealing should, in all cases, be able to show from the record that he has sustained real injury by reason of the rulings of the court below, which form the ground of the appeal, and where this court can see that the trial below was fairly conducted and that the law of the case was fully and substantially applied, the appellant obtaining the benefit of all the law to which he was entitled or which he sought to obtain, there can be no good reason for reversing the judgment for matters immaterial or upon mere refinements as to the terms in which propositions have been submitted to the jury. To justify a reversal there must be a substantial error apparent, and that to the prejudice of the defendant. If instructions be ambiguous or susceptible of different interpretations, the party liable to be affected by them should avail himself of the right to.have that which may be doubtful made clear and certain by more explicit instruction.”
The judgment below is affirmed.