# JOHN SNOWDEN

## *vs.*

# STATE OF MARYLAND.

*Appeals: time for; preparation of exceptions and record; sickness and absence of trial judge.   Criminal law: province of court and jury.   Evidence: rebuttal; discretion of court.   Photographs: when admissible. Irreversible errors.*

Where delay in having exceptions prepared and the transcript of the record made up is not due to the fault of the appellant, or his counsel, but to the sickness and absence of the trial judge, it presents no ground for dismissing an appeal where it appears that the exceptions were prepared with reasonable promptness.                              p. 628

On appeal, exceptions which are not signed by the trial judge will not be considered.                              p. 628

In criminal trials, where the traverser elects to be tried before a jury, the jury are the exclusive judges of weight and conclusiveness of the evidence, and the Court of Appeals has no power to disturb their finding, unless that court finds that during the trial the court below committed some error in its rulings.

p. 629

Where the doctor who examined the corpse and described the wounds he found upon it, photographs which he took of the wounds are admissible in evidence.                    p. 631

It is within the discretion of the trial court to recall a witness that he may explain his former testimony.        p. 635

The ruling of the court upon immaterial evidence is not reversible error.                              p. 635

The admission of evidence in rebuttal is in the sound discretion of the trial court, and its action will not be reviewed on appeal, unless it is clearly wrong and manifestly injurious.

p. 636

*Decided January 16th, 1919.*

Appeal from the Circuit Court for Baltimore County, whence it had been removed from Anne Arundel County. (DUNCAN, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*A. Theodore Brady* and *C. Gus Grason,* for the appellant.

*Nicholas H. Green, State's Attorney for Anne Arundel County,* and *Ogle Marbury, Assistant Attorney General* (with whom was *Albert C. Ritchie, Attorney General,* on the brief), for the appellee.

BURKE, J., delivered the opinion of the Court.

John Snowden, the appellant on this record, was indicted by the Grand Jury for Anne Arundel County for the murder of Lottie May Brandon, a young married woman living at No. 29 Second street, in the city of Annapolis. The murder was alleged to have been committed on the 8th of August, 1917. The indictment contained two counts. The first count alleged that the said John Snowden on the date and at the county aforesaid:

"In and upon one Lottie May Brandon in the peace of God and of the said State then and there being, feloniously, wilfully and of his malice aforethought did make an assault, and that he the said John Snowden, then and there the said Lottie May Brandon, by and upon the neck and throat of her the said Lottie May Bran-

don, with both the hands of him the said John Snowden, did feloniously, wilfully and of his malice aforethought, grasp and seize, thereby choking and strangling the said Lottie May Brandon, and that he the said John Snowden, with a certain blunt instrument, a further description whereof is unknown to the jurors aforesaid, in his hand then and there had and held the said Lottie May Brandon, in and upon the head of her the said Lottie May Brandon, then and there feloniously, wilfully and of his malice aforethought, did strike, giving to her the said Lottie May Brandon, then and there, with the blunt instrument aforesaid, a further description whereof is unknown to the jurors aforesaid, as aforesaid, by the stroke aforesaid, in and upon the head of her the said Lottie May Brandon, a mortal wound, of which said choking, strangling and mortal wound she the said Lottie May Brandon then and there died."

The second count alleged
"that the said John Snowden on the eighth day of August, in the year of our Lord nineteen hundred and seventeen, at the county aforesaid, feloniously, wilfully and deliberately premeditated malice aforethought did kill and murder Lottie May Brandon, contrary to the form of the Act of Assembly in such case made and provided against the peace, government and dignity of the State."

Snowden plead not guilty, and upon the suggestion of the State's Attorney for Anne Arundel County, the case was removed to the Circuit Court for Baltimore County for trial. The case was tried in that Court in January, 1918, and on the 31st day of January, 1918, the jury found Snowden guilty of murder in the first degree. A motion for a new trial was made and overruled, and on the 13th of February, 1918, the Court sentenced Snowden to be hanged. The appeal in this case was taken from that judgment.

The State has moved to dismiss the appeal upon two grounds: *First,* because the record was not transmitted to this Court within the time required by law; *second,* because the bills of exceptions were not signed during the term at which the judgment was entered, nor within any extension of the time for such signing which had been granted by the Court. The judgment, as we have stated, was entered on the 13th of February, 1918, and the order for an appeal was filed March 2, 1918. The appeal was, therefore, taken within the time required by Rule 23 of this Court. But the transcript of the record was not filed in this Court until October 5, 1918,—a little more than seven months after the order for appeal was filed. It was not transmitted earlier because the bills of exceptions were not signed until the 23rd of September, 1918. But the record shows that the delay in the signing of the exceptions and in the transmitting of the record were not chargeable to the default or to the laches of the appellant or his counsel. A certificate of JUDGE DUNCAN, who presided at the trial, appears in the record by which it is shown that the bill of exceptions *"in their present shape,"* were submitted to him by the counsel for the appellant before the 15th of April, 1918, * * * the time limited by previous orders of Court for filing exceptions being May 15, 1918. JUDGE DUNCAN told counsel that the exceptions should be presented to the State's Attorney for Anne Arundel County for approval, and they were presented to the State's Attorney for that county on or before April 12, 1918. On the 27th of April, 1918, the exceptions were again presented to JUDGE DUNCAN "in their present shape" without an agreement between counsel as to what they should contain having been reached. JUDGE DUNCAN took no action upon the exception, but handed them over to Mr. Hartman, the State's Attorney for Baltimore County, with the request that he go over the exceptions with Mr. Brady, one of the counsel for the appellant. JUDGE DUNCAN was absent from Towson by reason of illness from July 5th until September 16th, 1918, and he heard no more of the exceptions until the 12th of August,

1918, when they were received by him in New York. Before acting upon them, Charles S. Williams, one of the counsel for the appellant, called upon him and requested the return of the exceptions in order to go over them with the State's Attorney for Anne Arundel County. The judge did not see the exceptions again until about the 16th of September when they were returned to him by Mr. Williams for his action, no agreement having been reached. The exceptions were signed by JUDGE DUNCAN on the 23rd of September, 1918, and the bills of exceptions then acted upon were the same ones which on two occasions in April, 1918, had been presented to him by counsel for the appellant. It thus appears that the appeal was taken in time, and that the exceptions were prepared by the counsel for the accused with reasonable promptness, and submitted to the judge on two occasions within the time limited by previous orders regularly passed. This was all that was required of counsel, and under the circumstances stated it can not be held that the delay in signing the exceptions or transmitting the record was due to any fault of the appellant or his counsel. We said in *Wilmer* v. *Baltimore*, 116 Md. 338, that in cases at law it is the settled practice in this State in the event of a disagreement between counsel for the trial judge to determine what shall constitute the record. The motion to dismiss the appeal will therefore be denied.

During the progress of the trial sixty-six exceptions were taken by the appellant to rulings of the Court to questions of evidence. Forty-six of these exceptions are not pressed in this Court, but we have considered them carefully and find no reversible error in any of them. The exceptions relied on are the third, fourth, fifth, twelfth, fourteenth, fifteenth, sixteenth, twenty-first, twenty-third, thirty-first, thirty-third, thirty-fourth, thirty-seventh, forty-sixth, forty-seventh, forty-ninth, fiftieth, fifty-first, fifty-fourth and fifty-sixth. Three of the exceptions, viz, the fifth, fiftieth and fifty-first were not signed by the presiding Judge, and therefore can not be considered by us. They can not be regarded as valid excep-

tions. *Poe on Pleading and Practice,* 2 Vol., Sec. 321; *Jones v. State,* 118 Md. 67. Before passing on the remaining seventeen exceptions, which are relied upon for the reversal of the judgment, we will give a brief outline of some of the important facts upon which the State relies to convict the appellant.

It must, however, be borne in mind that this Court has no power to pass upon the guilt or innocence of the appellant. He elected to be tried by a jury. They were the exclusive judges of the weight and sufficiency of the evidence to establish the guilt of the accused, and we have no power to disturb their finding, unless we find that the Court during the course of the trial committed some reversible or injurious error either in the admission or rejection of testimony.

The following facts were proved by the State without contradiction: *first,* that Mrs. Brandon on the morning of August 8th, 1917, after the departure of her husband to take up his work at the Experiment Station, Annapolis, where he was employed, was seen alive at her home. One witness—Ida Burch—testified that on that morning she saw Mrs. Brandon come to the door of her home and pick up a paper and go into her house. She fixed the time she saw her as between half-past 10 and 11 o'clock. Another witness—Grace Myers—testified that she saw Mrs. Brandon on the day of her death about 10.30 or quarter of 11 o'clock. That Mrs. Brandon came to the door and picked up a paper and spoke to the witness. Another witness—Thomas A. King—testified that on the morning of the same day he saw Mrs. Brandon sitting in the kitchen window of her home. *Secondly,* that the apartment occupied by Mr. and Mrs. Brandon was the lower floor of 29 Second street, and consisted of three rooms and a bath, the middle room being the bedroom. About 5 o'clock on the afternoon of Wednesday, August 8th, 1917, Mr. Brandon returned from his work. He entered by the front door into the front room and called his wife. He went into the middle or second room, and found Mrs. Brandon lying on the bed. He spoke to her and touched her shoulder,

and she did not answer. He thought she had fainted or was sick. He became alarmed and went to get a physician. He notified a neighbor—Mrs. Burch—who lived nearby, and she went to the house, and found Mrs. Brandon dead. The fact of her death soon became known in the neighborhood, and a number of people gathered in and about the house. Dr. Joseph C. Joyce reached the house between 5 and 5.30 o'clock and found Mrs. Brandon dead. The body was lying on the left side, with the head to the foot of the bed; her hair was loose and wrapped around her neck, and her dress was pulled up about her knees and her limbs were exposed. Her limbs were bruised and her neck was scratched and bruised. She had a wound in her forehead from which the blood had flowed, saturating the sheet and mattress. Dr. Joyce made an autopsy of the body on the night of August 8th, 1917, at the Emergency Hospital, Annapolis, assisted by Dr. Walton H. Hopkins. He described the condition of the body as to bruises disclosed at the autopsy, which he said were the same bruises he noticed when he first went to the house and saw the body: "We found a bruise over the back of the left hand; we found a bruise between the first and second knuckle; found a bruise in the center of the forearm, anterior surface of the left arm; found a bruise on her right arm above the elbow, a corresponding one on the left elbow; found bruises, several bruises, over the neck, scratches on the side of the neck and a large bruise—— Q. (interrupt· ing) What did these bruises on the neck, what did they resemble, the appearance of them? A. The scratches resembled the appearance of nails. Q. Fingernails? A. Fingernails. Found a large depression in the center of the fore· head, the skin broken. You want me to tell what we found when we went in? Q. One miunte; were those the same bruises you noticed, Doctor, when you first went to the house and looked at the body? A. Yes; also two large bruises over the knee, right and left legs." He said the marks upon the neck which looked like scratches from fingernails were "curved back," and would have to be done by someone stand-

ing behind and not in front of Mrs. Brandon. He testified that Mrs. Brandon's death was a result of the blow on the forehead, strangulation and shock.

Dr. Hopkins, who saw the body of Mrs. Brandon at her home before the autopsy, testified that she died from shock as a result of her injuries. Several witnesses corroborated the evidence of Dr. Joyce as to the injuries to Mrs. Brandon, and there is really no contradiction of this evidence, and no real question that she died as the result of her injuries. During the examination of Dr. Joyce he was shown and identified certain photographs which he said represented the marks and bruises on the body of Mrs. Brandon at the time he first saw it and at the time of the autopsy. These marks and bruises were fully described in his evidence, and it was not denied that they existed. The defense objected to the offer and introduction of the photographs in evidence. Their objections were overruled, and these rulings constitute the third and fourth bills of exceptions. As these photographs were merely representations of injuries which had been fully described by the witness and not denied to exist, their introduction in evidence could not be held to have injured the accused. But aside from this, they were properly admitted. *Consolidated Gas Company* v. *Smith,* 109 Md. 186. Later in the trial the defense moved that these photographs be stricken out or withdrawn. This motion was overruled, and this ruling constitutes the twelfth exception. It follows from what we have said in disposing of the third and fourth exceptions that there was no error in this ruling.

The testimony to which we have referred and which was not denied by anybody was strong proof to show that Mrs. Brandon was murdered as charged in the indictment. If the evidence satisfied the jury that she had been murdered, it was incumbent upon the State, before Snowden could be properly convicted, to prove beyond a reasonable doubt that he had committed the murder. That was a question of fact for the jury. To show this fact the State relied upon the testimony of Mary Perkins, Edith Creditt and LeRoy Cisco,

together with certain facts and circumstances, some of which it will be necessary for us to allude to in passing upon the remaining exceptions. Mary Perkins and Edith Creditt were sisters, and lived at No. 30 Second street, directly opposite the Brandon home. This street is a narrow one. Briefly but substantially stated, Mary Perkins testified that on the day of Mrs. Brandon's death (Wednesday, August 8, 1917) she was sitting in her parlor at the parlor window, about 11 o'clock or a few minutes after 11 o'clock, writing a few letters. She had written one, and had started to write another, when her attention was attracted by a noise in Mrs. Brandon's house. She described it as a rushing sound towards the door, footsteps and a knock against the door, and she saw a chair "knocked in front of the window." She said her sister, Edith Creditt, came into the room where she was sitting and she told her about the noise she had heard. That in about fifteen or twenty minutes she saw the front door open, and she saw Snowden, whom she positively identified, inside the Brandon home at the front door; that "he looked towards Murray's Hill first and then towards West street; that was before he brought his whole body out of the door; and in coming out the door, when he closed the door, he closed the door from behind with his right hand; he never turned his back, and he walked off the porch, and when he got near the second porch he then began to fool with something that he took out of his pocket. I took it to be a bottle or flask—I mean it was reddish and looked as though it either had whiskey in it or it was a red flask—and he took it from his hip pocket and put it in front in some of his pockets, and he walked up the street and, in looking behind, my sister saw his face before he got far." That she saw him on Main street the following morning driving an ice wagon; that she had seen him before Mrs. Brandon's death, but did not know his name. Edith Creditt testified that her sister called her attention to the man; that he was then on the pavement, and she identified that man as Snowden, whom she had seen and knew before. She fixed the time as five or ten min-

utes of 12 o'clock. It was shown by the evidence of LeRoy Cisco, a colored boy, that he passed the Brandon home between 11 and 12 o'clock on the 8th of August, 1917; that he heard "a little noise" in the house and saw "a lady's arm start to come out the door, and somebody pulled her back and shut the door." A determined effort was made by the defense to break down the testimony of Mary Perkins and Edith Creditt, but the jury, who saw all the witnesses and heard all their testimony, evidently believed they told the truth.

The fourteenth and fifteenth exceptions were taken during the examination of Dr. William B. Carr, a physician and surgeon, who made a second autopsy upon the body of Mrs. Brandon at the Emergency Hospital in Washington on the 14th of August, 1917. The record shows that Snowden was arrested on August 13th, 1917, and was taken to the Sheriff's office in Annapolis. It was there discovered that he had some scratches on his face which appeared to be fresh scratches. He was asked to account for them, and he said that Edna Wallace, a woman with whom he was living, had inflicted those scratches more than a week before. The State was permitted to show by Dr. Carr that the autopsy performed by him disclosed particles of skin of a colored person under the fingernails of Mrs. Brandon. This testimony was important and, we think, under the circumstances clearly admissible. Dr. Hopkins assisted in the autopsy made in Washington, and the sixteenth exception was taken to the question asking him the results of the autopsy. The Doctor answered the question as follows: "After the clothes were removed an examination of the exterior of the body was made, and the various wounds that I mentioned that I found in the autopsy in Annapolis were still present. There was one wound made under the armpit—I think it was the right arm—where the undertaker had injected his embalming fluid. After noting these wounds, an examination was made of the hands." This answer was not harmful to the appellant. The twenty-first exception was taken to the action of the Court in overruling a motion to strike out all the evidence of Dr.

Joyce, Dr. Littz and Dr. Hopkins regarding an assault on or rape of Mrs. Brandon. The evidence of these physicians on the subject-matter embraced in the motion tended to show the condition of the body of Mrs. Brandon at the time it was discovered. It was admissible for that purpose. Whether it showed, in connection with all the other facts and circumstances in evidence, that a rape had been committed upon Mrs. Brandon was a question to be determined by the jury. The twenty-third exception was taken to the action of the Court overruling an objection to an answer made by Dr. Hopkins to a question asked on cross-examination as to the cause of Mrs. Brandon's death. His answer to the question was: "She died from shock as a result of her injuries." We can see no ground of objection to this answer. It tended to support the allegation as to the cause of death set out in the first count of the indictment. The thirty-first exception was taken under the following circumstances: Valentine Brandon, in his examination in chief, testified that before leaving home on the morning of August 8th he left a dollar bill with his wife, and that he never saw that dollar bill again. After he had concluded his testimony he was recalled by leave of the Court and asked this question: "Q. Didn't you tell Mr. Munford, at Annapolis, after the discovery of your wife's body that you had found your dollar bill in question?" The Court sustained the State's objection to the question. The question was too general and indefinite, and was properly excluded under the rule stated in *Poe on Pleading and Practice,* Vol. 2, Sec. 280, and in *Conrades* v. *Heller,* 119 Md. 448.

There is no merit in the thirty-third exception. It was taken during the examination of John M. Taylor, a funeral director and embalmer of Annapolis, who had prepared the body of Mrs. Brandon for burial. There appears to have been some confusion in or misunderstanding of his testimony as to the position of the hands of Mrs. Brandon after he had completed his work, and upon the application of the defense he was recalled to clear up any doubt on that point. It was

within the discretion of the Court to recall the witness, and his explanation of his prior answer as to the position of Mrs. Brandon's hands in the casket was a matter he was asked about, and the answer was proper.

During the examination of Rachel E. Stewart, a nurse, called for the defense, she was asked this question: "Have you had any experience with eclamptic patients?" An objection by the State to this question was sustained, and this ruling constitutes the thirty-fourth bill of exception. There was no offer to prove that Mrs. Brandon had died of eclampsia. There is absolutely nothing in the case to support such a suggestion, and the ruling was correct. In the thirty-seventh bill of exception it appears that the State was permitted to show, over the objection of the traverser, what church Mary Perkins attended. That was not a material inquiry, and the Court might have sustained the objection, but we do not see how the answer could have resulted in any injury to the appellant.

The forty-sixth, forty-seventh and forty-ninth exceptions were taken to the rulings of the Court refusing to permit the following questions to be answered. They were propounded to Mary J. Williams, a witness called by the defense:

First—"Q. During the night of August 7th, the night before Mrs. Brandon's body was found, did you hear any noise in that house?"

Second—"Q. Where were you between 11 and 12 o'clock on the night before Mrs. Brandon's body was found?"

Third—"Q. Was there or not any unusual noises or sounds coming from the Brandon home on that night, August 7th, between the hours of 11.30 and 12.30 o'clock?"

In view of the uncontradicted evidence of five witnesses, viz, Valentine Brandon, Ida Burch, Grace Myers and Mr. and Mrs. King, that Mrs. Brandon was alive on the morning of August 8th, 1917, and was seen by two of these witnesses at her house on that morning as late as 10.30 o'clock, and there being no evidence to connect anyone, except Snowden, with the crime, or to justify a suspicion that any par-

ticular person other than he had committed it, the proposed offer of testimony was clearly inadmissible and properly refused.

The fifty-fourth and fifty-sixth exceptions were taken to testimony in rebuttal by the State in contradiction of the evidence of Snowden wherein he testified to certain acts of maltreatment inflicted upon him by the police of Baltimore City at the time he made certain statements which had been put in evidence by the State. The witnesses offered in rebuttal were Samuel House, Deputy Marshal of Baltimore City, and Robert G. Carter, Marshal of Police of Baltimore City. They each gave testimony in denial of Snowden's evidence of abuse and maltreatment by the officers. In 2 *Poe on Pleading and Practice,* Sec. 287, it is said that "it is not always easy to draw the line between what is rebutting evidence and what is evidence properly adducible in chief. The subject is one which is addressed to the sound discretion of the court; and the appellate court will not reverse for an error on this point, unless the ruling of the court below was both manifestly wrong and substantially injurious. Indeed, as a general rule, in such cases no appeal will lie." See also *Bannon* v. *Warfield,* 42 Md. 39, and *Jones* v. *State,* 132 Md. 142. There was no error in these rulings.

We have given the case our most careful and earnest consideration, and we have found no reversible error committed by the trial Court in any of its rulings, and the judgment will, therefore, be affirmed.

*Motion to dismiss the appeal denied, and judgment affirmed, with costs.*