RICHARD E. HEPPLE *v.* STATE OF MARYLAND

[No. 714, September Term, 1975.]

* * *

JAMES EDWARD JONES *v.* STATE OF MARYLAND

[No. 730, September Term, 1975.]

*Decided June 4, 1976.*

The causes were argued before ORTH, C. J., and MORTON, MOYLAN, POWERS, GILBERT, MENCHINE, LOWE, MELVIN and MASON, JJ.

In Appeal No. 714, *Michael E. Kaminkow*, with whom was *Richard T. Rombro* on the brief, for appellant.

In Appeal No. 730, *Geraldine Kenney Sweeney, Assistant Public Defender*, with whom was *Alan H. Murrell, Public Defender*, on the brief, for appellant.

In Appeal No. 714, *Henry E. Dugan, Jr., Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City*, and *William Monfried, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

In Appeal No. 730, *Arrie W. Davis, Assistant Attorney*

*General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Francis A. Sauer, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court. MENCHINE, J., concurs in part and dissents in part and filed an opinion concurring in part and dissenting in part at page 558 *infra.*

The two September Term 1975 appeals we decide in this opinion, Richard E. Hepple v. State, No. 714, and James Edward Jones v. State, No. 730, present a common issue for decision. The issue relates to the place of rebuttal evidence in the order in which parties are required to offer their evidence. The Court of Appeals had the point before it in *Bannon v. Warfield,* 42 Md. 22, 39 (1875). It first explained why it was essential to have fixed rules on the subject and to observe them:

> "The observance of fixed rules upon the subject is of great importance, not only as means of avoiding confusion, but to the fair administration of justice. Much of course depends upon the form of the issues joined, and upon whom the *onus* rests. The parties must not be allowed to break up the evidence they may intend to offer on any particular issue, and introduce it at different stages of the cause in piece-meals, as the varying emergencies of the case may seem to require. Such practice would not only greatly prolong trials, but would frequently lead to surprise and injustice."

It set out the general rule:

> "According to the well established practice, the plaintiff, having the right to begin, must put in the whole of his evidence upon every point or issue which he opens, and the defendant then puts in evidence his entire case; and in reply the plaintiff is limited to such new points and questions as may be first opened by the defendant's evidence. I Greenl. Ev. sec. 469a."

The rule was stated in *Jones v. State*, 132 Md. 142, 148-149 (1918) in the words of "Mr. Poe in his second volume on *Pleading and Practice*, section 287": "The rule is that the plaintiff will be required to go fully into his own case-in-chief on these issues as to which he holds the substantial affirmative, and where, therefore, the burden of proof rests on him; and hence, in reply to the case made by the defendant, he will ordinarily be limited to what is strictly rebutting evidence." The Court set out the rule thus in *Mayson v. State*, 238 Md. 283, 288-289 (1965): "Ordinarily, an orderly conducted criminal trial anticipates the State adducing all of its evidence in chief and resting its case. The defense follows by producing its evidence tending to establish the accused's non-culpability, which includes the contradiction or rebuttal of the evidence offered by the State. Then the State is afforded an opportunity to produce its rebuttal evidence."

The rule for the order in which evidence is to be adduced is clear but not unyielding. *Bannon v. Warfield, supra*, at 39, recognized this:

> "From this general rule there may be departures to meet the requirements of particular cases; but the entire question, as to the mere order of proof, and under what circumstances evidence should be admitted or rejected when offered out of the proper order, in the absence of some positive rule of court upon the subject, must be allowed to rest in the discretion of the court directing the trial, as the tribunal best qualified to judge what the justice of the case may require in these respects; and hence from the rulings on such questions no appeal will lie. *R. R. Co. v. Stimpson*, 14 Pet. 448, 463; *Salmon v. Rance*, 3 S. & R. 311, 314; *Duncan v. McCullough*, 4 S. & R. 482; *Frederick v. Gray*, 10 S. & R. 182; 4 Phill. Ev. 708."

Almost a century later the Court was of like mind. It said in *Mayson v. State, supra*, at 289: "However, experience has shown that justice does not require the following of the

above course [of the adducing of evidence] as an inflexible and undeviable procedure." Thus, the question as to mere order of proof, and under what circumstances evidence should be admitted or rejected when offered out of proper order, has been clearly held to be within the sound discretion of the trial court. *Rickards v. State*, 129 Md. 184, 191 (1916). There appears to be no distinction in this regard between civil trials and criminal trials.

The question of the admissibility of evidence on the ground that it is offered out of proper order usually arises after the moving party — in criminal cases, the State — has rested its case and desires to reopen it to introduce evidence properly admissible in chief, or at the rebuttal stage of the trial when evidence is offered as rebuttal which is not proper rebuttal evidence.

## Evidence Adducible in Chief

Trial judges are vested with wide discretion in the conduct of trials. So, in *Hamm v. State*, 233 Md. 248, 249 (1964), no abuse of discretion was found when the trial court permitted the State, upon motion made after it had rested, to reopen the case for the purpose of offering another witness. And in *Stansbury v. State*, 218 Md. 255, 262 (1958) it was held that there was no abuse of discretion in the refusal of the trial court to allow the defendant to reopen or continue his case. The Court of Special Appeals in a number of cases has reviewed the contention that it was reversible error to permit the State to reopen its case for the purpose of proving important or even essential facts to support a conviction, and has found no abuse of discretion in a variety of circumstances. See *Spillers v. State*, 10 Md. App. 643, 649 (1971); *Jones v. State*, 2 Md. App. 356, 363 (1967); *Boone v. State*, 2 Md. App. 80, 99 (1967); *Tingler v. State*, 1 Md. App. 389, 392 (1967).

## Rebuttal Evidence

The Court of Appeals has set out what constitutes rebuttal evidence. In *Jones v. State*, 132 Md. 142, 148-149 (1918), it used the language of "Mr. Poe in his second volume on

*Pleading and Practice,* section 287" [1] : "[Rebuttal evidence is] evidence in regard to such new points and questions as were first opened by the defendant's evidence." In *Lane v. State,* 226 Md. 81, 90 (1961), the Court observed: "Any competent evidence which explains, or is a direct reply to, or a contradiction of, material evidence introduced by the accused may be produced by the prosecution in rebuttal." *Mayson v. State, supra,* at 289, combined the definitions of *Jones* and *Lane* thus: "[Rebuttal evidence] includes any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense."

Although the definition of rebuttal evidence is clearly stated, Mr. Poe was aware that what is simply defined may not be readily determined. He observed, § 287: "Still, it is not always easy to draw the line between what is rebutting evidence and what is evidence properly adducible in chief." The Court of Appeals shared Mr. Poe's view. *Jones v. State, supra,* at 149; *Snowden v. State,* 133 Md. 624, 636 (1919). Mr. Poe concluded that whether evidence was properly rebuttal evidence was a matter for the exercise of judicial discretion: "The subject is one which is addressed to the sound discretion of the Court; and the appellate Court will not reverse for an error on this point, unless the ruling of the Court below was both manifestly wrong and substantially injurious. Indeed, as a general rule. in such cases no appeal will lie." The assertion that "no appeal will lie" does not mean that the point may not be considered on appeal. It means simply that on appeal there will not be a reversal on the point unless the court's ruling was "both manifestly wrong and substantially injurious." Mr. Poe's view is the law of Maryland. The Court of Appeals quoted it in *Jones,* at 149, iterated it in *Snowden,* at 636, and reiterated it in *Kaefer v. State,* 143 Md. 151, 159-160 (1923) and applied it in deciding those cases. The discretionary power of the trial court to determine what constitutes rebuttal evidence has been more

---

1. The same language appears in 2 J.P. Poe, *Pleading and Practice,* § 287 (5th ed. 1925).

recently affirmed. In *Lane v. State, supra,* at 90, after defining rebuttal evidence, the Court said: "And what constitutes rebuttal testimony in a criminal prosecution is a matter resting in the sound discretion of the trial court." The Court repeated this in *Mayson v. State, supra,* and added, at 289, "and the appellate court should not reverse for error on this point, in the absence of a showing that the ruling of the trial court was both manifestly wrong and substantially injurious." Thus, there are two requisites for reversal on error in the trial court's ruling as to what constitutes rebuttal evidence. The first is that the ruling must be "manifestly wrong." [2] This means, we believe, that when it is not certain whether the challenged evidence is or is not proper rebuttal evidence, the trial judge's determination will be honored as a sound exercise of his discretion even if, on review, the appellate court thinks the determination was wrong. On the other hand, if it is clearly apparent that the evidence offered as rebuttal evidence is not properly rebuttal evidence, then the trial judge would be "manifestly wrong" in ruling that it was. In other words, there are reasonable boundaries in which the trial judge may exercise his discretion to determine whether evidence meets the test of rebuttal evidence. Outside of those boundaries, the nature of the evidence would be plain and obvious, and in ruling contrary to the manifest nature of the evidence the court would be "manifestly wrong."

The second requisite for reversal on error of the trial court's ruling as to what constitutes rebuttal evidence, is that the ruling is "substantially injurious." [3] We think that "substantially injurious" must be construed in the light of *Dorsey v. State,* 276 Md. 638 (1976). Reversal *vel non* for error in the determination of what constitutes rebuttal

---

**2.** The American Heritage Dictionary of the English Language (1969) defines "manifest" as "clearly apparent to the sight or understanding; obvious." Webster's Third New International Dictionary (1968) gives as a definition: "capable of being easily understood or recognized at once by the mind."

**3.** The American Heritage Dictionary of the English Language (1969) defines "substantial" as "considerable in importance, value, degree, amount or extent."

evidence is to be governed by the harmless error rule as explicated in *Dorsey*. The Court said, at 659:

> "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of — whether erroneously admitted or excluded — may have contributed to the rendition of the guilty verdict."

Therefore, if the trial judge went outside the discretion he enjoys to admit challenged evidence as rebuttal, and his erroneous ruling thereon is not harmless, reversal is mandated because the ruling was "both manifestly wrong and substantially injurious."

*Lane v. State, supra,* appeared to introduce another aspect into the matter of the order of the introduction of evidence. It said, without explanation: "This Court has held that it is within the sound discretion of the trial judge to allow evidence in rebuttal that should have been offered in chief." 226 Md. at 90. It gave *Kaefer v. State, supra,* and *Rickards v. State, supra,* as authority. The statement was repeated in *Mayson v. State, supra,* and then the Court proceeded to say what this did not mean:

> "This does not mean that the court should not be alert in preventing the State from deliberately withholding a part of its testimony (such as that which is merely cumulative to, or corroborative of, that already offered in chief) in order to have testimony favorable to its case repeated at the end of the trial for the effect that it may have upon the trier of facts. *State v. Driver,* 183 A. 2d 655, 673. cf. 2 Poe, *Pleading & Practice,* § 287; *Archer v. State,* 45 Md. 33."

The explanation elucidates what the Court did mean. If "at the rebuttal stage of the trial" is substituted for "in rebuttal", the meaning of the statement is clarified. The Court merely rephrased the previously established rule that it is within the discretion of the trial court to permit the State to reopen its case to introduce evidence adducible in chief. The statement has nothing to do with "rebuttal evidence"; it concerns evidence adducible in chief. The prosecution does not need the permission of the court to offer evidence to rebut. It has the right to introduce such evidence at the rebuttal stage of the trial, and unless objection is made to the admission of the evidence, it is received and goes before the trier of fact. As the State has the right to introduce evidence for rebuttal, the only discretion in the court upon challenge is to determine whether it is in fact rebuttal evidence. In both *Lane* and *Mayson* the comment about the admission of evidence "in rebuttal that should have been offered in chief", was immediately preceded by a discussion of the discretion which the court has to determine what constitutes rebuttal evidence. We think the statement merely pointed up that the court has discretion to permit the State to reopen its case in chief as distinguished from the discretion to determine whether evidence offered in rebuttal is properly rebuttal evidence. This view is supported by *Rickards v. State, supra,* given in *Lane* as authority for the statement. *Rickards* was not concerned with rebuttal evidence as such. Counsel for the accused had stated in open court that he expected during the course of the trial to put a certain witness on the stand. He failed to do so and while the State was presenting its case in rebuttal, it was granted leave to call the witness. On appeal the Court found no error because the evidence adduced through the witness was competent to be proved as part of the State's case, and the order in which the proof should be offered was a matter of the sound discretion of the trial court which was "affirmatively shown to have been fairly exercised in view of the situation which had developed." 129 Md. at 191. *Kaefer v. State, supra,* the other case cited in *Lane* as authority for the statement, does not

denigrate our view. Evidence was offered in *Kaefer* to rebut and it was found to be properly admissible for that purpose. 143 Md. at 159.

The two discretions enjoyed by the trial court, the one to permit the moving party to reopen its case to introduce evidence adducible in chief,[4] and the other, to determine whether evidence offered to rebut is truly rebuttal evidence, are separate and distinct. As to both, of course, the evidence must be competent, relevant and material.[5] With respect to reopening the case, the judge must consider whether the State deliberately withheld the evidence proffered in order to have it presented at such time as to obtain an unfair advantage by its impact on the trier of facts. To this end the judge must see whether the proposed evidence is merely cumulative to, or corroborative of, that already offered in chief or whether it is important or essential to a conviction. With respect to rebuttal evidence, the judge must consider whether the evidence explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the accused. Thus, the considerations involved in the exercise of the two discretions are materially different. The sound exercise of discretion to allow the State to reopen its case provides no basis for finding that evidence meets the definition of rebuttal evidence, and *vice versa.*

## SUMMARY

In the frame of reference of the order in which evidence is to be presented in a criminal case — the case in chief by the State, the case in defense by the accused, rebuttal by the

---

**4.** The request by the State to reopen its case after it has rested may come before the defense has presented its case or thereafter before the close of all the evidence, as for example, at the rebuttal stage of the trial. No matter when, after it has rested, the prosecution desires to reopen its case to present evidence it could have adduced during its case in chief, it may do so only with permission of the trial court. The factors to be considered by the court in exercising its discretion when to grant the request may vary according to the time at which the request is made, however.

**5.** We note: "It is a well settled rule of evidence, that the introduction of improper or immaterial evidence on one side does not justify the introduction of irrelevant matter on the other . . . ." Bannon v. Warfield, *supra,* at 40.

State — there are two basic situations in which a question may arise. The first is when the State, after it has rested, and before the case goes to the trier of fact, asks the trial court to permit it to reopen its case to introduce evidence which should have been offered in its case in chief. Of course, the prosecution may reopen its case for this purpose only upon permission of the trial court. The wide discretion enjoyed by the trial court in this matter has been consistently recognized on appellate review. The second situation concerns rebuttal evidence. The prosecution does not need the permission of the court to offer evidence in rebuttal. It has this right at the rebuttal stage of the trial, provided that the evidence is otherwise admissible. If objection is made on the ground that the evidence offered is not proper rebuttal, then whether it is proper is, within the limits above discussed, in the sound discretion of the trial court. If the trial court admits the evidence, its discretion was soundly exercised if, on judicial review, the appellate court finds that the challenged evidence was proper rebuttal evidence. If the appellate court finds that the challenged evidence was not proper rebuttal, a manifest error in admitting it requires reversal unless it may be deemed harmless. But, to be deemed harmless, the appellate court, upon its independent appraisal of the record, must be able to declare a belief, beyond a reasonable doubt, that the admission of the evidence in no way influenced the verdict, being satisfied that there was no reasonable possibility that the evidence may have contributed to the rendition of the guilty verdict.

What we have said — that a manifest error in admitting evidence as rebuttal, over objection, requires reversal, unless harmless — is so, even when the same evidence, offered in chief, or after leave to reopen, would have been admissible. It is not enough to say that the trial court had the discretionary power to grant leave to reopen and admit the evidence. If the trial court was not called upon to exercise its discretion to permit the State to reopen its case, there can be no appellate review for abuse of that discretion.

As we have seen, the discretion to determine what

constitutes rebuttal evidence [6] is materially different from the discretion to permit the State to reopen its case. An erroneous exercise of discretion in one area cannot be held to be a proper exercise, in another area, of a discretion never invoked, much less exercised by the court. Such a holding as to challenged evidence offered as rebuttal would abrogate the rule requiring the orderly presentation of evidence. We think it is necessary to preserve that rule.

*Hepple v. State, No. 714, September Term, 1975*

On 13 May 1975 in the Criminal Court of Baltimore, Richard E. Hepple was found guilty by a jury of receiving goods valued at more than $100 stolen from Robert S. Eary. Code, Art. 27, § 466. A sentence of four years was imposed. He appealed.

Robert S. Eary testified that on 15 June 1973 he purchased a Silver-Top Camper for the sum of $406.64, which he attached to a three-quarter ton Ford pickup truck. On 22 July the truck and camper were stolen from in front of his

---

6. In the cases which we have examined honoring the discretion of the trial court to determine the admission *vel non* of evidence offered in rebuttal, it appeared that there was substantial basis that the evidence was truly rebuttal evidence within the contemplation of the rule set out in *Lane.* For example, in *Jones* some of the evidence offered in rebuttal "had reference to new matters testified to by the [accused], and of which the prosecutrix had no knowledge, if her evidence be true; and some of it to special matters of defense which the State could not anticipate." 132 Md. at 149. In *Snowden* the rebuttal evidence denied the accused's testimony that police officers abused and maltreated him. 133 Md. at 636. In *Kaefer* "[t]he evidence in chief produced by the State was to the effect that the strikers threw stones, used clubs, and fired shots, and the evidence in question was offered by the State in rebuttal of the evidence produced by the defendants to show that there were no acts of violence on the part of those assembled at the mine until after shots were fired by the employees of the mining company. . . ." 143 Md. at 159. In *Lane* the challenged evidence offered in rebuttal contradicted testimony of the accused. 226 Md. at 90. *Rickards*, as we have indicated, involved evidence admissible in chief, not rebuttal evidence. *Mayson* turned on the rule that "when a broad and general motion to strike certain testimony is made and, at least, a portion thereof is admissible, the motion should not be granted . . . ." 238 Md. 289. The Court found that a part of the challenged testimony could properly be admitted as rebutting testimony.

In the cases which we have examined in which there was a reversal, the evidence was found to be evidence which not only did not constitute rebutting evidence but would not have been admissible in chief. See, for example, Dobson v. State, 24 Md. App. 644 (1975), *cert. den.,* 2 June 1975. Setzer v. State, 29 Md. App. 347 (1975), *cert. den.,* 2 March 1976.

home. On 28 July his truck was located and recovered, but the camper was not located and recovered until 7 September 1973 when it was found attached to another truck which was owned by Louis Romm. Romm testified that as a result of a telephone call from William Woolford,[7] he later received a call from Hepple, who told him he had a camper for sale and would like to know whether Romm was interested in purchasing it. Romm went to Hepple's home. The camper was in Hepple's yard "right alongside of the house." Romm and Hepple discussed the price of the camper. "We picked it over, and looked at it, and it had extensive damage. The lights had been busted on it, and it had a large crease down the side, and the door was broken in, and the screen was damaged." Hepple wanted $150 "but after extensive discussion about the damage and what have you, we settled on an agreed price of $100.00." Hepple and Romm discussed how Romm would get the camper away from Hepple's yard. Romm had a pick-up truck with wooden side racks. He and Hepple removed the racks, storing them in Hepple's garage, picked up the camper, placed it on the truck and, with Hepple's tools, bolted it on. Romm gave Hepple $100 in cash and later gave him $5 for the tools used in the installing of the camper on the truck. On 7 September 1973 Romm was approached by two Maryland State Police Officers and questioned about the camper. He told them from whom he had purchased it.[8] The officers said it had been stolen and impounded it. Romm called Hepple. Romm was "quite hot about what had happened. . . . I asked him why he didn't tell me at least that the thing was stolen. I think it was a pretty dirty trick, and he told me, he said, look, he said, what you should have told them was that you purchased it from somebody in a bar. . . . I told him I was not experienced at that type of dealings, and if that's the way he wanted to do

---

7. In the transcript of the proceedings Woolford's name is spelled "Wilford". The stenographer noted in the index that "the correct spelling throughout the transcript should be Woolford."

8. Romm said he had not received any "indicia of ownership" from Hepple. "I asked him where he got the cap. . . . He stated to me that it was his cap, that he had on his pick-up truck, and he had just recently gotten rid of that, and had a van, and he pointed to a black type van truck in front of his house."

it, let him tell them that he purchased it from somebody in a bar."

Woolford was the only witness for the defense. He said he had known Hepple for three or four years and Romm for eight or nine years. He denied that he had "business discussions with Mr. Romm concerning Mr. Hepple." He talked to Romm about Hepple after Romm was arrested but not before. To his knowledge he could not remember if he "at anytime" gave Romm Hepple's telephone number. He denied that he ever asked Hepple to call Romm. On cross-examination Woolford denied that Romm had indicated that he was looking for a camper to put on his pick-up truck. Romm made no mention about a camper. Although Woolford usually saw Hepple every Monday night, Woolford never "indicated to Mr. Hepple that Mr. Romm had a new pick-up truck and was interested in a camper." "I never said anything about a camper, no, sir." Woolford was again asked if he did not tell Hepple that Romm needed a camper cap and answered: "No, sir." Woolford summed up his testimony:

> "The only thing I know about this camper is when the police, or Mr. Romm called my house and asked me for Mr. Hepple's last name. He asked me for Ricky's last name. I said, Hepple. He said, where does Ricky live? I said, he lives on Casadel, but I'm not sure of, or I think I said it's Casa something. I couldn't exactly remember. In fact, I think now, but then he says, well, what he's phone number? I give him the number. Then he later called me that night and told me that he had been arrested for a camper cap. This is the first time that I have ever knew about a camper cap."

On re-direct examination the subject was pursued:

> "Q. Now, have you ever seen Mr. Richard Hepple either driving or owning a pick-up truck?
>
> A. No, sir. I seen him drive a van one time.
>
> Q. A van?

A. Yes, sir.

Q. But he has never owned, to your knowledge, a pick-up truck?

A. No, sir.

Q. Did you ever see Mr. Hepple in the possession of a camper cap? . . .

The Witness: No, sir. . . .

Q. Have you ever seen in the possession of Mr. Hepple a camper cap?

A. No, sir.

Q. So, you have never seen a pick-up truck, and you have never seen a camper cap in the possession of Mr. Hepple?

A. No, sir.

Q. Did Mr. Hepple ever mention to you that he wanted to sell a camper cap?

A. No, sir."

On re-cross examination Woolford was asked: "Were you present over Mr. Hepple's house when Mr. Hepple allegedly sold a camper top to Mr. Romm?" Woolford answered: "I have already testified that I have never seen a camper top."

Hepple rested and moved for judgment of acquittal. Court recessed upon request to enable the State to consider whether to offer rebutting evidence. When court reconvened, the prosecution called Daniel Paul Eric Washenfeldt, expressly offering him as "a rebuttal witness."

Washenfeldt testified that he knew Hepple "through working for him in a sense." The "sense" in which he worked for Hepple was that he "stole for him." He was asked what he meant and at a bench conference out of the hearing of the jury, defense counsel declared a belief that this was not "proper rebuttal testimony." The transcript reads:

"THE COURT: Why not?

MR. KANDEL [Nelson Kandel, Esq., defense counsel]: In other words, making out that he's a professional.

THE COURT: Do you want to proffer?

MR. KANDEL: He has to proffer something that he stole for him.

THE COURT: I guess that's what he means when he says he stole for him. Mr. Hepple has produced a witness who, in effect, has said that he never saw him in possession of a pick-up truck or a camper.

MR. KANDEL: Well, that —

THE COURT: Wait a minute. More particularly the inference is that this camper was, or the pick-up truck, or the camper cap, this witness I gather, you're offering the witness for that purpose, Mr. Monfried. Is that what you're offering him for?

MR. MONFRIED [Assistant State's Attorney]: That's correct.

MR. KANDEL: Yes, but he's doing it in a shotgun manner. He stole for him.

THE COURT: He hasn't asked him what he stole yet. I gather he's going to get to it.

MR. MONFRIED: My next question.

THE COURT: I gather he's going to get to that.

MR. KANDEL: Suppose he stole a million other things?

THE COURT: I don't know what he's going to say.

MR. KANDEL: I think it would be grounds for a mistrial.

THE COURT: Maybe it will be, but we haven't reached that point.

MR. MONFRIED: That's right.

THE COURT: If he says that he stole a toothbrush and here we're talking about a camper, then perhaps the inference — maybe I'll entertain your motion. I gather that what you're proffering is, that you're going to show, that he stole this particular camper.

MR. MONFRIED: Oh, yes, Your Honor.

THE COURT: All right. There's no shotgun about that. That's a bullet. It might not be the one that you want to see, but I don't have anything to do with that, but the inference is here, I take it. I'm only trying to understand the testimony.

MR. KANDEL: If that's all it is, it's okay.

THE COURT: He's saying this man produced Mr. Woolford to indicate that he was never in possession of any camper, no camper cap, no pick-up truck, specifically, particularly one that is now proved to have been stolen. That's the inference.

MR. KANDEL: He never saw one, yes, but he couldn't tell, he couldn't answer specific questions when and where.

THE COURT: All right."

The proceedings resumed before the jury with the court's comment to defense counsel: "You had an objection, and your objection is overruled." The direct examination of Washenfeldt continued. Hepple telephoned Washenfeldt about 22 July 1973 and said he wanted a Silver Top camper. "He just said that, you know, when I get it to come down his house. . . . I looked all night and in the early morning . . . I had found one . . . in the Brooklyn area. I had occasion to drive with a friend down to a side street, and we were looking around, and I noticed a brand new truck had a camper on it. We pulled up close to it, and I read the name tag on the side, and it said Silver Top." Washenfeldt stole it and drove it to Hepple's house, arriving about 7:00 or 7:30 A.M., and "told him I had what he had called." Hepple and Washenfeldt took the camper off the truck, placed it on the sidewalk and "threw a tarp over it to hide what it was." Hepple gave him $50. Hepple wanted to get rid of the truck. Followed by Hepple, Washenfeldt drove it "far out Washington Boulevard" to a motel. Hepple said, "Just leave it over there and park it . . . ." and then drove Washenfeldt back to Hepple's house. A few days later Washenfeldt

returned to Hepple's house and saw Hepple and another man installing the camper on a Dodge pick-up truck.

Washenfeldt was cross-examined extensively. On re-direct examination it was elicited that he had stolen campers for Hepple "quite a few times", although Eary's camper was the first one. "I would get a call from Mr. Hepple. He would determine, you know, what he wanted, and I would go out looking for it." Each time he stole a camper he "took it to Mr. Hepple, and to his house, and whatever he wanted done with it, we would do, dismantle there or take it somewhere else."

It is clear that the evidence adduced through the testimony of Washenfeldt was not proper rebuttal. It did not explain, directly reply to, or contradict new matter brought into the case by the defense through its only witness, Woolford. There was nothing in Washenfeldt's testimony to show that Woolford had "business discussions with Mr. Romm concerning Mr. Hepple", or that he had asked Hepple to call Romm, or that Romm had indicated to Woolford that he was looking for a camper, or that Woolford told Hepple that Romm was looking for a camper, or that Woolford had seen Hepple driving or knew of his owning a pick-up truck, or had knowledge that Hepple owned a pick-up truck, or had seen Hepple in possession of a camper cap, or that Hepple had mentioned to Woolford that he wanted to sell a camper cap or that Woolford was present at Hepple's house when Hepple sold a camper to Romm. It was clearly apparent that Washenfeldt's testimony was not properly rebuttal evidence, and therefore, the ruling of the trial court was "manifestly wrong." Upon our independent review of the record, we are unable to declare a belief, beyond a reasonable doubt, that the admission of Washenfeldt's testimony in no way influenced the verdict. Thus, the error was not harmless, and was "substantially injurious." As the two requisites for reversal on error in the trial court's ruling with respect to the rebuttal evidence are present, the judgment must be reversed.

Hepple also contends that Washenfeldt's testimony about "independent crimes" committed by Hepple was inadmis-

sible under the "other offenses rule" and as improper re-direct examination. Having found Washenfeldt's testimony to have been inadmissible as improper rebuttal, there is no need to reach these claims. As to the first claim, however, see *Cothron v. State*, 138 Md. 101 (1921); *Laws and Dorman v. State*, 6 Md. App. 243 (1969). Compare *Ross v. State*, 276 Md. 664 (1976). As to the second claim, see *Fisher Body Division v. Alston*, 252 Md. 51 (1969); *Cooper v. Davis*, 226 Md. 371 (1961). Compare *Bailey v. State*, 16 Md. App. 83 (1972).

### *Jones v. State, No. 730, September Term, 1975*

James Edward (Jimmy) Jones was employed early in 1969 as a "street minister" by Reverend Stanley Knock, Jr., an ordained minister of the Methodist Church. Reverend Knock, one of four staff ministers whose duties included the supervision of Jones, worked in the Southwest Christian Parish, an "umbrella organization" composed of about half a dozen Methodist and Episcopal churches. Jones was part of a program of the Episcopal Diocese. "He was to work out of the All Saints Episcopal Church Building at 1849 West Baltimore Street to see if there was a way to help, particularly youth and young adults on the streets that . . . the Church had not been able to help. These are largely people who are outside of traditional church, people therefore, with a considerable degree of problems of one kind or another. . . . Specifically [he was] to work with youth and young adults who were trying to solve their personal problems, who were trying to re-establish life patterns; these could include runaways, include those who were having drinking problems, trying to get them back into school whenever this was appropriate and they were in the age range. Frequently to work with those who were having drug problems, trying to get them off of drugs and, in general, trying to maintain communications with the street culture." Until 1973 Jones's salary "was $3,000 for three-quarters time worked. Two years ago we ran out of the funding for it and he was not receiving any salary since that time. . . . He was asked to continue to stay in the house and

[we] would cover the operational expenses of the house [gas, electricity, water, sewer] out of the remaining program money." The "house", which belonged to the Episcopal Diocese, was at 1845 West Baltimore Street next to the Church. Other people also stayed there. "This was part of the program, we expected that there would be people in the house. We knew there were through all the years involved." [9]

In October 1974 Jones was arrested. On 10 December criminal informations were filed in the Criminal Court of Baltimore, informing the court about crimes he was alleged to have committed on 13 September 1974.[10] Information 27402558 charged that he received money from the earnings of a certain woman named Denise Carrington who was engaged in prostitution (1st count), that he compelled Denise to live a life of prostitution (2nd count), and that he engaged "in prostitution, lewdness and assignation" (3rd count). Information 27402560 charged that he assaulted Denise with intent to mark and disfigure her (1st count), that he burned her face and body with intent to maim her (2nd count), and that he assaulted and beat her (3rd count). Trial on the informations commenced before a jury in the Criminal Court of Baltimore on 21 April 1975 [11] and concluded on 24 April. Jones' was convicted under the 3rd count of each information. On 15 May he was sentenced to 10 years on the assault conviction and to a concurrent sentence of 1 year on the prostitution conviction. He appealed.[12]

According to Denise Carrington, Jones's work with troubled young people was not as Reverend Knock envisioned. Denise was a 14 year old runaway who said she

---

**9.** What we have set out concerning the employment of Jones is a compendium of the testimony of Reverend Knock on behalf of the defense at Jones's trial in the Criminal Court of Baltimore, discussed *infra*.

**10.** Jones's arrest was followed by the filing in the District Court of statements of charges against him as required by Maryland District Rule 706, § (c) 3. The crimes charged were felonies over which the District Court did not have jurisdiction. See Courts Art. § 4-302 (a).

**11.** The State went to trial on all three counts of Information 27402558 and on the 3rd count only of Information 27402560.

**12.** A motion for a new trial was heard and denied on 15 May 1975. An application for review of sentence was filed on 17 June 1975. On 30 July the Review Panel ordered that the sentence remain unchanged.

had been approached in the Trailways Bus Station by a special officer who introduced her to Jones. Jones solicited her to engage in prostitution with him as her pimp. He put her up at 1845 West Baltimore Street, gave her "a black sparkling suit", and sent her out with his other girls to "prostitute". Because Jones thought she was double-crossing him, she was stripped, beaten and burned by Jones, certain of his girls and a friend of his known as Fish.[13] Jones told her, "Next time, you will learn to do what I tell you to do." The girls involved were Wanda Matthews, Evelyn Richardson and Elvira Newby, Jones's girl friend. They all stayed at 1845 West Baltimore Street at the invitation of Jones. Wanda and Evelyn, each 16 years old, corroborated Denise's story about the beating and burning. Wanda said she and Evelyn "prostituted" for Jones.[14] Evelyn said Jones told her he expected her "to go out in the street and work". She assumed that he meant that she was to "prostitute" for him. She did so but claimed that she "never made no money".

The defense adduced evidence through the testimony of five witnesses: the defendant, Jones; an eyewitness, Elvira Newby; an alibi witness, Thelma Jones; and two character witnesses, Reverend Knock and Frank Fonte, Jones's parole officer.

Jones's version of his employment by the Southwest Christian Parish was in substantial accord with that of Reverend Knock. At one time he had used the house as his permanent residence but in September 1974 he resided with his wife Thelma at 2510 Shirley Avenue, spending about 2 or 3 nights a month at 1845 West Baltimore Street. He

---

**13.** Denise recounted the torture of her in lurid and sordid detail. Although, at times, she was apparently reluctant to answer some questions, she eventually answered the majority of them. At the conclusion of her testimony, the court denied a motion to strike the testimony "on the ground it is unbelievable," and because she "was not responsive to questions." The examination of her at the trial comprises 110 pages of the transcript.

**14.** Wanda testified that she was a runaway. She went to school in the morning and engaged in prostitution for Jones at night. She charged fifteen or twenty dollars and gave three-quarters of her earnings to Jones. She had pleaded guilty in the Criminal Court of Baltimore to assaulting Denise but had not yet been sentenced at the time of Jones's trial.

admitted he met Denise at the bus station through a special officer and that she stayed at the house. He claimed that he had little contact with her because his wife was incapacitated and he was needed at home. Elvira informed him by telephone that Denise had been injured and he went to the house two or three days later. "When I went to the house, Denise was sitting in the den with her hands over her face. I spoke to her. I could not stay because I had business elsewhere. She asked me could she go with me. I said, no, not at the moment, but what you could do, you could stay here and Vie [Elvira Newby] will see to it that [if] there is anything you need until I return, she will give it to you." The room was dimly lit, and he did not notice any marks on Denise at the time. He did not see Denise again until the trial. He denied any participation in the assault. He was asked about the accusations that he was pandering. The transcript reads:

"BY MR. EVERING [George C. Evering, Esq., defense counsel]:

Q. The allegation has been — you have been sitting here — that you have received money from these young ladies for the purpose of prostitution, is that correct?

A. Those are the correct allegations.

Q. But did you?

A. No, I did not.

Q. Did you ever receive any money from Wanda for prostitution?

A. No, sir.

Q. Did you ever receive any money from Elvira for prostitution?

A. No, sir.

Q. Did you know she had been convicted of prostitution?

A. Yes, once.

Q. And did you receive any money from Wanda — Evelyn?

A. Yes, I received money from Evelyn.

Q. And what did you receive money from Evelyn for?

A. Evelyn wanted her own apartment and she had asked me would I make arrangements to get one and I didn't give her any guarantees, I said that I would try."

On cross-examination he said he was "assuming" that Wanda was lying when she said she worked for him, although he did not know of any reason why she would lie about him, "the person who helped her." He repeated his denial that Elvira worked for him or that she paid him any money.

Elvira Newby claimed that Jones was not present when Denise was beaten and burned by Evelyn, Wanda and Fish. She admitted that she had lived at 1845 West Baltimore Street with Jones in a "boy friend — girl friend relationship" for about three years and that she was a prostitute. She denied, however, that she worked for Jones, asserted that Wanda did not work for Jones, and said that she had never seen Evelyn give Jones any money.

At the close of the defense's case, the State indicated that it had rebuttal evidence to offer. When the prosecutor called Sharon Reynolds in rebuttal, defense counsel requested a bench conference. At the bench he asked the State what it expected to prove through the witness. The prosecutor replied:

"I proffer to prove through this witness, she was, in fact, in May of 1974, a run-away. She was picked up by Jimmy Jones, put on the street by Jimmy Jones, lived at 1845 West Baltimore Street. She pimped for Jimmy Jones and, in fact, she was brutally beaten in the same manner Denise Carrington was by Jimmy Jones."

The defense objected. It was the State's position that the proffered evidence was admissible to establish the identity of the accused — "he took the stand and he vehemently

denied being involved at 1845 West Baltimore Street." The State believed it was admissible to establish Jones's identity as to the assault also "[h]e vehemently denied ever assaulting Denise Carrington." The judge ruled:

> "Here is what I am going to do: permit you to ask her questions relating to her being a runaway, her being solicited for prostitution at that address. I am not going to permit you to ask any questions about the assault."

This ruling made both sides unhappy; both took exception. The judge iterated: "I am going to permit it on that limited basis only." After discussion about another aspect of the proposed witness's testimony, not here germane, defense counsel made further objection:

> "I have to go further than that. I think that this is inflamatory. I think allowing this witness at this stage of the game would prejudice the rights of the defendant and I think that the purpose of offering this witness is not to prove a material fact in this case, merely to inflame the jury. And I think that this case is bad enough at the present time. Now, from my point of view, it is unnecessary to bring this witness in."

The judge observed: "What he is doing is rebutting the testimony. He had nothing to do with pandering operations at this address, and this evidence, of course, is admissible to show a course of conduct." Referring to *Wethington v. State,* 3 Md. App. 237 (1968), concerned with exceptions to the rule that "proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged, is incompetent and inadmissible for the purpose of showing commission of the particular crime charged. . . .", the judge continued: "In other words, it shows as to the fourth [exception], a common scheme or plan embracing the commission of two or more crimes so related to each other that . . . proof [of] one tends to establish the

other." See 3 Md. App. at 240. The judge noted: "It doesn't prove that he was operating on the 13th as they allege. I am not permitting it for the assault." Defense counsel was not placated: "Your Honor, I point out to you that whether or not you are permitting it to the assault or to the pandering scheme, it goes to both of them that these facts are so interrelated that it is impossible to separate one of them in the minds of the jury." The judge indicated that he believed that the State was taking a "chance", but concluded: "I will permit it if the State wants me to. I will permit this question." The prosecutor was adamant: "I am willing to take that risk." Sharon Reynolds testified before the jury over "vehement exception" again offered by defense counsel.

Sharon Reynolds, 14 years old, ran away from home in August 1974.[15] She recounted her meeting with Jones:

> "Well, I was walking down the street, it was on Monroe Street. . . . And a car was driving up the street and he beeped his horn and I walked up to the car and he rolled the window down and asked me if I needed a lift. I said, yes. I told him to take me up on Belair Road to my girlfriend's house. So we was riding and he wasn't taking me the right way. I told him it wasn't the right way. He took me over to a house on Baltimore Street."

The house was 1845 West Baltimore Street. Evelyn Richardson, Wanda Matthews and Elvira Newby were there. She spent the night. The next morning Jones's brother, Willy, awakened her and took her out in his car. They rode around all day and about 8:00 p.m. he took her to 2304 Utah Place, [16] told the owner of the house they were married and gave him rent. Willy "shot some dope" and then "lit up a bowl of pot." "So then he told me to stay here until

---

**15.** Sharon first placed the year as 1970, but it was promptly determined that the correct year was 1974.

**16.** So spelled in the transcript. There is a "Eutaw Place" in Baltimore City.

he got back and so I stayed there. It was about two days I
waited there. No food or nothing. And it was at nightime. I
was getting ready to go to bed. I got in the bed, I turned the
T.V. on and was watching the story. I fell asleep. Then I
heard this big bang on the door and I wouldn't let them in.
They kept on banging and banging and banging. So then
they went around to the fire escape. I left the window open
that night and they crawled in the window. . . . It was
Jimmy, Fish, Willy, Elvira, that was all, Wanda." Sharon
made a judicial identification of Jones as the "Jimmy" she
referred to. The transcript reads:

"Q. When they came in, did you have an occasion
to have a conversation with Jimmy?

A. Not a conversation.

Q. Then subsequent to that, did you have a con-
versation with Jimmy?

A. Yes, Willy called Jimmy over.

Q. What was this conversation about?

A. Prostitution.

Q. What was the conversation that you had with
Jimmy?

\* \* \*

A. It was, you know, asking me to go out on the
street for him that night and I didn't go out, so —

BY MR. SAUER [Francis A. Sauer, Esq., Assistant
State's Attorney]:

Q. Okay. You say this was Jimmy that asked you
to do this, is that correct?

A. Yes, sir.

Q. Did you at any time ever go out on the street for
Jimmy?

A. No, sir.

Q. And then there came a time that you left that
house?

A. That is correct, yes, sir.

Q. Had you seen Jimmy since then?

A. No."

At the bench, defense counsel moved for a mistrial. The motion was denied. The prosecutor said:

"I also, for expediency, would proffer to defense counsel having talked to this witness, when they mentioned the fact she had a talk with Jimmy and she indicated she did not want to prostitute. Then I asked her did she subsequently leave, and it was at that time she was beaten the same way that Denise Carrington was. I am advising defense counsel of this."

It is obvious that this proffer was made in the light of the court's ruling that Sharon was not to testify concerning the assault of her by Jones. The judge explained to defense counsel: "What he is telling you, for the record is, if you ask the question, you have no one to blame for it but yourself." On cross-examination Sharon Reynolds denied that she prostituted for Jones at 1845 West Baltimore Street or that she ever prostituted anywhere for him.[17]

---

17. In charging the jury, the court included a caution about the testimony of Sharon Reynolds:

"Furthermore, I want to caution you with regards to the testimony of one witness in this case, Sharon Reynolds. You will recall she was called in rebuttal by the State and I permitted her to testify to certain events which she said occurred in August of 1974. The general rule is that evidence of prior offenses or prior crimes allegedly committed by a defendant are generally not admitted in evidence when he is on trial for the commission of an alleged subsequent crime. The reason for the rule is, that the jury must determine from the evidence presented in this case whether the defendant is guilty beyond a reasonable doubt of any or all of the three crimes of which he has been charged. And evidence of any crime which he may have committed at an earlier time should not be used against him for that purpose. There are exceptions to this rule, however, where the identity of the accused is at issue, evidence may be received of prior offenses which bear upon that identity. Also, evidence of prior offenses is admissible to show a common scheme or plan embracing the commission of two or more crimes which are related to each other. It is under these exceptions that the Court permitted this testimony, but I caution you that you are not to consider the testimony of Sharon Reynolds for any other purpose and specifically you are not to consider her testimony as

It is manifest that the testimony of Sharon Reynolds was offered by the prosecution to rebut evidence adduced by the defense and was so considered by the court and the parties. The State had rested its case in chief. Jones had closed his defense. The State indicated that it desired to produce evidence in rebuttal. When the proffered testimony of Sharon Reynolds was challenged, the prosecutor expressly stated that her testimony was to rebut Jones's denial of being involved at 1845 West Baltimore Street and his claim that he did not participate in the assault. When further objection was interposed, the court observed that the State was rebutting "the testimony that [Jones] had nothing to do with pandering" at 1845 West Baltimore Street. The prosecutor made no request to reopen the State's case in order to introduce evidence adducible in chief. The testimony of Sharon Reynolds was offered by the State and accepted by the court and the defense as in rebuttal.

On appeal Jones persists in the contention that the court below erred in admitting the testimony of Sharon Reynolds offered by the State as rebuttal. We agree. The State was ill-advised in pressing its effort to have the challenged testimony admitted, and in assuming the risk so clearly pointed out to it by the court. It is clear that the evidence adduced through the testimony of Sharon Reynolds was not proper rebuttal. It did not explain, reply directly to, or contradict new matter brought into the case by the defense. Keeping in mind that the court ruled that her testimony was not to be considered as rebutting Jones's denial that he assaulted Denise, but as rebutting, according to the State, Jones's "vehement denial" of being "involved at 1845 West Baltimore Street," [18] and, as rebutting, according to the

showing that because the defendant may have committed crimes earlier, that he committed the crimes with which he is charged in this case on or about September 13, 1974."

We do not find in the transcript of the trial an objection to this part of the charge.

**18.** The evidence adduced was not in accord with the proffer. Sharon's testimony tended to establish that she was a runaway, and that she was picked up by Jones. It did not show that she was put on the street by Jones, that she "lived" at 1845 West Baltimore Street, and that she "pimped" for Jones.

judge, testimony that Jones had nothing to do with pandering operations at 1845 West Baltimore Street, we see no evidence adduced by the defense which was as indicated by the State and the court. The State, in its case in chief, had adduced evidence tending to show that Denise Carrington, Wanda Matthews, Evelyn Richardson and Elvira Newby stayed at 1845 West Baltimore Street at the invitation of Jones. Jones did not deny this. The State's evidence was also that Jones had solicited Denise, Wanda and Evelyn to engage in prostitution with him as their pimp. There was no evidence that Denise gave Jones any money which she earned as a prostitute; in fact, she denied that she engaged in prostitution. Evelyn claimed, that although she "prostituted" for Jones, she had not made any money therefrom. Jones denied that he had "received money from these young ladies for the purposes of prostitution." He specifically denied that he received money from Wanda and Elvira Newby [19] for prostitution. He admitted that he received money from Evelyn but not as a panderer; the money was given to him to obtain for her an apartment of her own. Sharon Reynolds's testimony that in August 1974 Jones picked her up, that she stayed one night at 1845 West Baltimore Street, that Jones's brother put her up at another address where she remained for two days until Jones, his brother, Fish, Wanda and Elvira appeared, and that Jones talked to her about going out on the street as a prostitute for him, does not explain Jones's denial that Denise, Wanda and Evelyn gave him money they earned by engaging in prostitution, nor does it reply directly to that denial, nor is it a contradiction of that denial. The State suggests that in introducing the rebuttal testimony of Sharon Reynolds, "the prosecution was attempting to counter the impression created by [Jones's] defense that his only concern was in the welfare of the juveniles who stayed at his home. . . . [I]t matters not that the incident involving Sharon Reynolds occurred at a different house." It is true that the testimony

---

**19.** As set out, *supra,* Elvira Newby testified for the defense. She admitted she was a prostitute, but denied she worked for Jones.

of Sharon Reynolds would tend to show Jones as a "bad man". But we condemned the "bad man theory" in *Dobson v. State, supra;* in *Setzer v. State, supra,* we declared that it may not be injected into a trial in the guise of rebuttal testimony.

It being "clearly apparent" that the testimony of Sharon Reynolds was not properly rebuttal evidence, the ruling of the trial court to admit it was "manifestly wrong." Upon our independent review of the record, we are unable to declare a belief, beyond a reasonable doubt, that the admission of the challenged evidence in no way influenced the verdict. Therefore, the error was "substantially injurious." As the two requisites for reversal on error in the trial court's ruling with respect to rebuttal evidence are present, the judgment must be reversed.

Jones also contends that the trial court erred "in denying [his] motion to suppress evidence seized from his house without warrant." [20] The issue was raised at trial during the State's case in chief. Md. Rule 729, § c. An evidentiary hearing was had out of the presence of the jury on a motion made by the defense to suppress tangible evidence seized by the police at 1845 West Baltimore Street. The court denied the motion. We determine the propriety of the denial because Jones may be retried on remand.

It is firmly established that the admissibility of evidence claimed to have been obtained by an unreasonable search and seizure is a matter exclusively for the trial court. *Cleveland v. State,* 8 Md. App. 204 (1969), *cert. denied,* 257 Md. 732 (1970); *Price v. State,* 7 Md. App. 131 (1969), *cert. denied,* 256 Md. 747 (1970); *Winebrenner v. State,* 6 Md. App. 440 (1969). The proceedings here were in compliance with our direction in *Winebrenner* at 444:

"The trial should be conducted so as to reflect clearly what testimony and other evidence was

---

**20.** The articles seized were evidentiary items, the "implements used in creating the wounds on Denise Carrington" — boxing gloves, two coat hangers, an African ceremonial spear. See Palmer v. State, 14 Md. App. 159, n. 10 at 164-165 (1972). The articles were admitted as State's Exhibit No. 2.

received on the issue of the admissibility of the challenged evidence and the ruling of the trial judge as to ... the reasonableness of the search and seizure and the admissibility of the challenged evidence should be stated by him."

The court explained its denial of the motion:

"The Court finds the following facts from the evidence before it. That the premises, 1845 West Baltimore Street, were on the 14th of September, 1975, lawfully occupied by Ms. Newby, although her exact status as a lawful possessor has not been established. I further find that there is no evidence of the ownership of the property and no evidence really of Mr. Jones' interest in the property. I further find that the time of the entry on September 14, 1974, when State's Exhibit Number 2 was removed therefrom, that Mr. Jones was not on the premises and consequently under the doctrine, [*Lopata v. State*, 18 Md. App. 451 (1973) *cert. denied*, 269 Md. 762 (1973)] although he had been on the premises on prior occasions, he has not met his burden of proof to establish his standing to raise a Fourth Amendment infringement of his rights." [21]

The court's understanding of the law was correct. We said in *Duncan and Smith v. State*, 27 Md. App. 302, 304 (1975), judgment vacated on certiorari for other reasons, 276 Md. 715 (1976):

"It is, of course, black letter law that only a 'person aggrieved by an unlawful search and seizure' may challenge the constitutional validity of

---

[21]. The court gave as an alternative reason for denying the motion that Elvira Newby, as a lawful resident of the premises, consented to the search and to the seizure of the articles. We have no need to determine the propriety of this alternative holding. But see United States v. Matlock, 415 U. S. 164 (1974); Frazier v. Cupp, 394 U. S. 731 (1969); United States v. Green, 523 F. 2d 968, 971 (9th Cir. 1975); United States v. Novello, 519 F. 2d 1078, 1080 (5th Cir. 1975); and United States v. Bussey, 507 F. 2d 1096 (9th Cir. 1974).

that search and seizure. *Jones v. United States*, 362 U. S. 257, 261, 80 S. Ct. 725, 4 L.Ed.2d 697, 702 (1960). It is not enough that someone's right to be free of unreasonable search and seizure has been abrogated; it is necessary that the right abridged be that of the defendant personally. *Alderman v. United States*, 394 U. S. 165, 173, 89 S. Ct. 961, 22 L.Ed.2d 176, 186 (1969). One must establish that it is *his own* direct or derivative enjoyment of property or expectation of privacy that has been invaded before he may challenge the invasion. *Walters v. State*, 8 Md. App. 583, 261 A. 2d 189; *Palmer v. State*, 14 Md. App. 159, 286 A. 2d 572; *Lopata v. State*, 18 Md. App. 451, 307 A. 2d 721; *Brown v. United States*, 411 U. S. 223, 93 S. Ct. 1565, 36 L.Ed.2d 208 (1973)."

In other words, a person seeking to suppress evidence obtained by an unlawful search and seizure must first establish his standing to object. The burden of asserting and establishing standing is upon the one seeking to suppress, *Duncan and Smith*, 27 Md. App. at 310-317, and he must establish his standing affirmatively by a preponderance of the evidence, *Lego v. Twomey*, 404 U. S. 477 (1972). The elements of standing were set out in *Lopata v. State, supra*, at 453:

"Standing to object to the search of a place must be based upon either of two relationships to the situs of the search:

(1) A present possessory interest in the property searched; or

(2) Legitimate presence on the premises." [22]

On appellate review of the question of standing to object we consider only that "evidence that was submitted to the trial judge in the separate hearing, out of the presence of the jury, on the motion to suppress the property as evidence or

---

[22]. As to automatic standing see Duncan and Smith v. State, 276 Md. 715 (1976).

the objection to its admissibility. That some of the same evidence, and more, was presented to the jury in the trial on the issue of guilt, does not mean that we consider more evidence than that which was before the trial judge on the question of admissibility." *Glover v. State,* 14 Md. App. 454, 459 (1972), *cert. denied,* 265 Md. 737 (1972). Cf. *Waugh v. State,* 275 Md. 22 (1975).

In the case *sub judice,* Officer Gary Dresser of the Baltimore City Police Department was the only witness at the suppression hearing. The defense offered no evidence at all. It is clear from Dresser's testimony that Jones was not at 1845 West Baltimore Street when the officer went there and obtained the articles after receiving information from Denise at the hospital about her beating and burning. His knock on the door was answered by Elvira Newby. He explained why he was there. She told him the implements were in the cellar and he received permission from her to take them. The officer did not know who owned the building and, at the time, did not know whether it was rented — "I would assume from the sign that was on the door it was a rectory to the church next door." No one objected to his being there. Dresser had been there once before in May 1974 at which time Jones and Elvira Newby were on the premises. The police had been called for the purpose of evicting Jones's brother. Jones said that his brother was drunk. Jones wanted the brother out of the house. The only information Dresser had with respect to residents of the house he had received from Denise who referred only to Elvira and three girls. He did not know that Jones "took in drug addicts and alcoholics and wayward girls." He did not even know that the house was connected with the church "in certain activities in the neighborhood." On recross-examination he was asked what interest Elvira Newby, Wanda Matthews and Evelyn Richardson had in 1845 West Baltimore Street. He replied: "Elvira Newby told me she was Jimmy Jones' girlfriend. Two juveniles, after interviewing them, told me that they worked for Mr. Jones, tricked for Mr. Jones, prostituted for Mr. Jones. In return, they stayed at that location, paid no rent, room and board."

We find that on the evidence adduced at the suppression hearing, the court below was not clearly erroneous in his judgments that there was no evidence of the ownership of the property and no evidence of Jones's interest in the property, and that Jones was not on the premises when the evidence was seized. The court below properly applied the law to the facts found, and correctly concluded that Jones did not affirmatively establish any direct or derivative right in the searched premises. It is our independent constitutional appraisal that Jones had no standing to object to the seizure of the challenged evidence. We hold that the court below did not err in denying the motion to suppress.

Jones's last contention is that the trial court erred in refusing to strike the testimony of Denise Carrington on the grounds that it "was marked by self-contradiction, admissions of lying, refusals to answer, and persistent memory failure." Because we are reversing the judgments, there is no need to determine it. For a discussion of the application of the doctrine of *Kucharczyk v. State*, 235 Md. 334 (1964), however, see *Bailey v. State*, 16 Md. App. 83, 93-97 (1972).

> *As to Richard E. Hepple, No. 714, September Term, 1975:*
>
> *Judgment reversed; case remanded for a new trial; costs to be paid by the Mayor and City Council of Baltimore.*
>
> *As to James Edward Jones, No. 730, September Term, 1975:*
> *Judgments reversed; case remanded for a new trial.*[23]

*Menchine, J., Concurring and Dissenting:*

I concur in the result in *Hepple v. State*, No. 714, September Term, 1975, because I believe that the evidence

---

23. Jones was represented by the Public Defender.

admitted in rebuttal would have constituted reversible error even if it had been admitted during the trial in chief.

I respectfully dissent from the decision in *Jones v. State*, No. 730, September Term, 1975, upon the ground that the testimony of Sharon Reynolds was proper rebuttal evidence, in that: (a) it tended to restore the credibility of the witness Wanda Matthews vis-a-vis the appellant, and (b) it tended to destroy the validity of appellant's testimony that he had not engaged in pandering or used the premises 1845 W. Baltimore Street in aid of prostitution.

I strongly oppose, however, the basis for decision of the majority as to both cases.

In *Lane v. State*, 226 Md. 81, 172 A. 2d 400 (1961), it had been clearly and succinctly stated at 90 [405]:

> "This Court has held that it is within the sound discretion of the trial judge to allow evidence in rebuttal that should have been offered in chief."

In *Mayson v. State*, 238 Md. 283, 208 A. 2d 599 (1965), the Court of Appeals repeated that language in the course of a more extensive discussion of the nature of appellate review in cases wherein the trial court had allowed admissible, but non-rebuttal evidence, at the rebuttal stage of a trial. It was said at 288-89 [602-03]:

> "Ordinarily, an orderly conducted criminal trial anticipates the State adducing all of its evidence in chief and resting its case. The defense follows by producing its evidence tending to establish the accused's non-culpability, which includes the contradiction or rebuttal of the evidence offered by the State. Then the State is afforded an opportunity to produce its rebuttal evidence. This latter includes any competent evidence which explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense. *Lane v. State*, 226 Md. 81, 90. *However, experience has shown that justice does not require the following of the above*

*course as an inflexible and undeviable procedure.*
This Court has held that what constitutes
rebuttal testimony in a criminal prosecution is a
matter resting in the sound discretion of the trial
court, *Lane v. State, supra,* and *the appellate court
should not reverse for error on this point, in the
absence of a showing that the ruling of the trial
court was both manifestly wrong and substantially
injurious. Kaefer v. State, 143 Md. 151, 160. We have
also held that it is within the sound discretion
of the trial court to allow evidence in rebuttal
that should have been offered in chief. Lane v.
State, supra.*

"This does not mean that the court should not be
alert in preventing the State from deliberately
withholding a part of its testimony (such as that
which is merely cumulative to, or corrobative of,
that already offered in chief) in order to have testi-
mony favorable to its case repeated at the end of
the trial for the effect that it may have upon the
trier of facts." (Emphasis added.)

As I read *Mayson, supra,* the Court of Appeals said two
things:

1. The trial judge has a sound discretion to deter-
   mine whether evidence is or is not rebuttal, and
2. The trial judge has a sound discretion to deter-
   mine whether admissible evidence, concededly
   not rebuttal, should be permitted in evidence
   during the rebuttal state of a case.

In *Snowhite v. State, use of Tennant,* 243 Md. 291, 221 A.
2d 342 (1966), the Court of Appeals, speaking through
Barnes, J., reiterated the second holding of *Mayson,* saying
at 306 [350]:

". . . normally it is within the discretion of the
trial court to allow testimony on rebuttal which, in
fact, does not rebut."

The majority opinion effectively reduces the discretion of the trial court to the question whether the evidence is or is not truly rebuttal — a narrow range indeed. Wholly eliminated is the discretion of the trial judge to allow the introduction of non-rebuttal evidence in the rebuttal phase of trial — unless accompanied by a motion to reopen the case.

It seems clear to me that both the *question whether evidence is rebuttal* and the *question whether non-rebuttal evidence should be admitted* during the rebuttal stage of a trial are matters within the sound discretion of the trial court. Appellate review in cases involving the latter question should take the form of an examination of the record as a whole to determine — not whether there was harmless error — but rather whether the admitted evidence, *by reason of the time of its admission,* imposed *a substantial additional dimension of harm.*

Application of the harmless error rule to *admissible evidence* that is objectionable *only because of the timing of its introduction,* is unsound. The majority opinion exalts form over substance.

I would reverse as to *Hepple;* affirm as to *Jones.*